**Aida Ortiz SANTINI, Appellant (Plaintiff Below),**

v.

**CONSOLIDATED RAIL CORPORA-TION, a Pennsylvania Corporation; Elkhart County 4-H Fair Board, D.M. Shorling and R.L. Elliott, Appellees (Defendants Below).**

No. 4-485 A 109.

Court of Appeals of Indiana, Fourth District.

March 31, 1987.

Jack P. Cittadine, Elkhart, for appellant.

Edward J. Chester, Chester & Chester, Elkhart, for appellees.

MILLER, Judge.

Aida Ortiz Santini sued Conrail and its train engineer and brakeman for the wrongful death of her 11 year old daughter, Nancy—after the warning signal began to blink—Nancy attempted to cross a triple Conrail track when her sandal became caught on the third track and she was struck by a Conrail train traveling 50 miles per hour through the crossing. Santini claimed Conrail and its agents were negligent in operating the train and in constructing and maintaining the crossing. The jury rendered a general verdict for all defendants. Santini appeals, claiming the trial court erred in excluding evidence of two City ordinances, the first limits train speed to 25 miles per hour in the City and the second requires Conrail to erect and maintain a safety gate across the Monroe Street crossing. Santini also argues the trial court erred in refusing to give her jury instruction number 7 and in giving final instruction no. 22 on the proper measure of damages for the wrongful death of a minor child.

We find the city speed ordinance is preempted by the Federal Railroad Safety Act of 1970, 45 U.S.C. § 434, and by the Federal Railroad Administration regulations contained in 49 C.F.R. § 213.9; the city crossing safety gate ordinance is invalid as the Indiana legislature has vested exclusive authority pursuant to I.C. 8–6–3–1 and I.C. 8–6–7.7–2 in the Public Service Commission to declare as dangerous any grade crossing in the state which requires installation of crossing safety devices; and Santini has failed to preserve error on appeal regarding the final jury instruction on the measure of damages for the wrongful death of a child.

Affirmed.

### FACTS

At 6:00 p.m. on July 23, 1978, 11 year old Nancy Santini, her 15 year old aunt Nydia Ortiz, and her 12 year old uncle Jose Ortiz were walking south on Monroe Street on

their way to the Elkhart County Fair. Monroe Street is intersected by three separate sets of railroad tracks and the railroad crossing is 100 feet wide. The Monroe Street crossing was the primary entrance and exit to the fairgrounds used by most of the 36,500 persons who attended the Fair on July 23, 1978.

As the three children approached the crossing, the warning lights began to blink. Pedestrians had approximately 18 to 20 seconds to complete crossing the three sets of tracks before the train, traveling at 50 miles per hour, would arrive.

Jose and Nydia Ortiz ran safely across to the east side of the Monroe Street tracks. Nancy caught her sandal in the crossing boards on the third track and was unable to extricate her foot. The train approached the crossing at 50 miles per hour. The train engineer saw Nancy hesitate on the track but did not immediately apply the brakes. The train struck Nancy and threw her into the air. Nancy died as a result of her injuries.

Nancy's mother, Aida Ortiz Santini, brought suit against Conrail and its train engineer and brakeman for the wrongful death of Nancy. Santini alleged Conrail and its agents were negligent in operating the train in violation of a Goshen City ordinance No. 163 which limits maximum train speed to 25 miles per hour within the City, and that Conrail and its agents were negligent in constructing and maintaining the triple crossing in violation of Goshen City Ordinance No. 14–1 which requires Conrail to erect and maintain a safety gate across the Monroe Street Crossing.[1] Before trial, Conrail made a Motion in Limine to exclude these two ordinances from evidence alleging they are invalid, and therefore inadmissible as a matter of law, because these two ordinances regulate railroad safety and are preempted by the 1970 Federal Railroad Safety Act, 45 U.S.C. § 421 et seq. Alternately, Conrail argued the city was without authority to enact the speed and safety gate ordinances because the state enabling legislation permitting the city to continue to enforce these ordinances had been repealed so all ordinances adopted under the enabling act were null and void.[2] The trial court initially granted Conrail's Motion in Limine and excluded evidence of the two city ordinances on grounds the Railroad Safety Act of 1970 specifically preempted both ordinances because the local speed and safety gate regulations were an unconstitutional interfer-

---

1. The following Goshen City ordinances were enacted pursuant to 1905 Indiana Acts, Chapter 129, Section 53:

    1) *Section 14–1. Railroad crossings.*
    (b) The Penn-Central Railroad Company, or its successors in interest, shall install and maintain railroad crossing safety gates at the intersection of its tracks with the following places:
    Cottage Avenue
    Lincoln Avenue, East
    First Street
    Pike Street and Fifty Street intersection
    Main Street
    *Monroe Street*
    Wilkinson Street
    (c) It shall be unlawful for any person to fail to comply with this section.
    2) *ORDINANCE NO. 163.*
    *ORDINANCE LIMITING THE SPEED OF LO-COMOTIVES OR CARS ON RAILROADS US-ING STEAM POWER WITHIN THE CITY LIM-ITS*
    Be it ordained by the Common Council of the City of Goshen, Indiana:
    Section 1. It shall be unlawful for any railway company, or for any officer, agent, or employee thereof using steam motive power to run any locomotive or car within the corporate limits of the City of Goshen at a rate of speed exceeding twenty-five (25) miles per hour.
    Section 2. Any railway company, its officers, agent or employees, shall be fined not less than one dollar nor more than fifty dollars for the violation of section of this ordinance.
    The record does not indicate when the two City ordinances were enacted.

2. Conrail also argues the municipal ordinance regulating speed was inapplicable on its face because it refers to locomotives operated by "steam motive power" and the Conrail train at issue was diesel powered. *See* footnote 1 for the text of Ordinance No. 163. Further, Conrail asserts the ordinance requiring safety gates was designed to warn and prevent motor vehicles from crossing the railroad tracks when a train is approaching so, as a pedestrian, Nancy is not within the class of persons designed to be protected by the safety gate ordinance. Since we find both the speed and safety gate ordinances are preempted by federal and state statutes, respectively, we need not address these arguments.

ence with and burden upon interstate commerce. Santini objected at trial to the exclusion from evidence of these two ordinances. Santini filed a Motion to Correct Errors after trial and argued the trial court's grant of Conrail's Motion in Limine and the later exclusion of these two ordinances from evidence at trial was error and prevented Santini from arguing Conrail was negligent *per se* in its operation of the train and its maintenance of the crossing. Santini pointed to the testimony of the Goshen City Attorney, out of the presence of the jury, that both ordinances were valid and in force at the time of Nancy's death and at least one speeding citation had been issued to a train. Santini argued this is sufficient foundation for the admission of the ordinances as evidence and therefore exclusion was improper.

The trial court denied Santini's Motion to Correct Errors and ruled the Goshen City ordinances were inadmissible because the Indiana 1905 State Enabling Statute was repealed, invalidating the two city ordinances which were adopted under this statute. Santini now appeals from the denial of her Motion to Correct Errors.

### Issues

Santini raises the following issues, restated, for review on appeal:

I. Whether the trial court erred in excluding from evidence the City ordinance limiting the speed of locomotives to twenty-five (25) m.p.h.

II. Whether the trial court erred in excluding from evidence the City ordinance requiring Conrail to erect and maintain a safety gate across its Monroe Street crossing.

III. Whether the trial court erred in refusing Santini's instruction regarding the proper measure of damages for wrongful death of a minor child.

### DECISION

■ Where the trial court sustains an objection to the admission of evidence, it will be upheld on appeal if there is any basis upon which the ruling is correct. *Hahn v. Ford Motor Company* (1982), Ind.

App., 434 N.E.2d 943; *Sheets v. Garringer* (1963), 135 Ind.App. 488, 194 N.E.2d 757. Any valid theory of exclusion will suffice to sustain the trial court's ruling. It is equally well-settled that the appellant has the burden not only of proving that error occurred in the exclusion of evidence, but also that such error was prejudicial because it affected the substantial rights of the parties. *City of Indianapolis v. Robinson* (1981), Ind.App., 427 N.E.2d 902; *Richardson v. Brown* (1977), 173 Ind.App. 50, 362 N.E.2d 197. With this standard of review in mind, we examine appellant's contentions.

### I. City Speed Ordinance

Santini argues the trial court incorrectly excluded from evidence Goshen City Ordinance No. 163 which requires trains to limit their speed to 25 m.p.h. within Goshen City limits. Santini maintains this ordinance is not preempted by the Federal Railroad Safety Act of 1970 because no federal authority has been exercised to limit train speed and therefore both states and municipalities are free to regulate in this subject area. Conrail responds that the Federal Railroad Administration has acted to limit train speed by adopting and promulgating the regulations contained in 49 C.F.R. § 213.9.

■ The Supremacy Clause, U.S. CONST. art. VI, cl. 2, nullifies state laws that "interfere with or are contrary to" federal law. *Hillsborough County v. Automated Medical Laboratories, Inc.* (1985), 471 U.S. 707, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (quoting *Gibbons v. Ogden* (1824), 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23). Congress is authorized to absolutely preempt state and local rulemaking authority in a particular field. *Pacific Gas and Electric Co. v. State Energy Resources Commission (1983)*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752; *Jones v. Rath Packing Co.* (1977), 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604. "Even where Congress has not entirely displaced state and local rulemaking in a specific area, these lower laws are preempted to the extent that they conflict

with federal law. Where a lower law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines v. Davidowitz* (1941), 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581], it is preempted." *Rollins Environmental Services, Inc. v. Parish of St. James* (5th Cir.1985), 775 F.2d 627, 634. Congressional intent to preempt state law in a given subject area may be inferred from the existence of a comprehensive scheme of federal regulation. *Hillsborough, supra,* 105 S.Ct. at 2375. Preemption is also inferred when the area of law is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Co.* (1947), 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447. State laws may be preempted by federal regulation as well as by federal statute. *Hillsborough, supra,* 105 S.Ct. 2375 (citing *Capital Cities Cable, Inc. v. Crisp* (1984), 467 U.S. 691, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580.). However, it will not be presumed that a federal statute or regulation was intended to supersede the exercise of state rulemaking authority unless there is a clear manifestation of intention to do so. *Evansville Airport v. Delta Airlines* (1972), 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620. Federal regulation of a field of commerce should not be deemed preemptive of state regulatory power unless the nature of the regulated subject matter permits no other conclusion or Congress has unmistakeably so ordained. *Florida Lime and Avocado Growers, Inc. v. Paul* (1963), 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed. 248. While prior cases on preemption are not precise guidelines because each case turns on the peculiarities and features of the federal regulatory scheme at issue, it is clear that federal preemption is not lightly to be presumed, but where there is a pervasive and comprehensive scheme of federal regulation, particularly when the subject is one traditionally committed to federal regulation, then state and local enactments which stand as a major obstacle to the accomplishment of Congressional objectives are invalid.

Congress enacted the Federal Railroad Safety and Hazardous Materials Transportation Act of 1970, Pub.L. No. 91–458, 84 Stat. 971 (1970) (current version at 45 U.S.C. §§ 421–441 (1986)) to promote and regulate safety in all areas of railroad operation, and its declared purpose is:

"to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous materials."

45 U.S.C. § 421 (1986).

The United States Secretary of Transportation is charged with the duty to prescribe all necessary rules, regulations, orders, and standards for all areas of railroad safety. 45 U.S.C. § 431 (1986). The Secretary of Transportation has delegated these responsibilities to the Administrator or the Federal Railroad Administration (FRA), a unit of the Department of Transportation. 49 C.F.R. § 1.49(M) (1986). Congress specifically addressed preemption and state rulemaking authority in the Act in Section 205:

"The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the same subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce."

45 U.S.C. § 434.

Although Section 205 manifests Congress' intent to create a nationally uniform system of railroad safety and indicates that the federal system preempts state regulation in the area, Section 205 also expressly

provides for state regulation of railroad safety in two limited situations: (1) where the federal government has not acted; and (2) where a) necessary to eliminate or reduce an essentially local safety hazard, b) there is no incompatible federal regulation, and c) the state regulation does not create an undue burden on interstate commerce.[3]

The first key inquiry, therefore, is whether the federal government has regulated "covering the subject matter" of train speed limits. The Federal Railroad Administration initially adopted on October 20, 1971, under the authority of 45 U.S.C. §§ 431 and 438 and 49 C.F.R. 1.49(N), a regulation governing the maximum speed of trains on six classes of railroad track. Effective October 1, 1977 through September 30, 1978, 49 C.F.R. § 213.9 (1977) provided, in pertinent part, as follows:

"§ 213.9  Classes of track: operating speed limits.

(a) Except as provided in paragraphs (b) and (c) of this section and §§ 213.57(b), 213.59(a), 213.105, 213.113(a) and (b), and 213.137(b) and (c), the following maximum allowable operating speeds apply:

[In miles per hour]

| Over track that meets all of the requirements prescribed in this part for – | The maximum allowable operating speed for freight trains is – | The maximum allowable operating speed for passenger trains is – |
| --- | --- | --- |
| Class 1 track ............ | 10 | 15 |
| Class 2 track ............ | 25 | 30 |
| Class 3 track ............ | 30 | 60 |
| Class 4 track ............ | 60 | 80 |
| Class 5 track ............ | 80 | 90 |
| Class 6 track ............ | 110 | 110 |

(b) If a segment of track does not meet all of the requirements for its intended class, it is reclassified to the next lowest class of track for which it does meet all of the requirements of this part. However, if it does not at least meet the requirements for class 1 track, no operations may be conducted over that segment except as provided in § 213.11."

This regulation was in effect on July 23, 1978, the date of the accident. It is not

**3.** Several federal courts and the Indiana Court of Appeals have addressed the intent of Section 205. In *Black v. Baltimore and Ohio Railroad Co.* (1980), Ind.App., 398 N.E.2d 1361, Judge Robertson, writing for the First District, stated:

"Due to the national structure of the railroad industry, legislation dealing with the railroads should not be construed strictly. A narrow interpretation of the Federal Railroad Safety Act would frustrate its purpose. (citations omitted).

Similarly, we feel the congressional intent of the Act was to pre-empt most state regulation dealing with railroad safety and since the Act's goal was to establish uniform control of railroad safety, the statutory and regulatory provisions evince a 'total pre-emptive intent.' (citations omitted)."

*Black, supra* 398 N.E.2d at 1363.

*See Consolidated Rail Corporation v. Pennsylvania Public Utility Commission* (E.D.Pa., 1982), 536 F.Supp. 653, *aff'd* (3rd Cir.1982) 696 F.2d 981, *aff'd* (1983), 461 U.S. 912, 103 S.Ct. 1888, 77 L.Ed.2d 280 (assuming proper test for preemption of Pennsylvania statute requiring locomotives to have speed recorders and indicators was contained in Federal Railroad Safety Act of 1970, 45 U.S.C. § 434, state statute was preempted because federal regulation covered same subject matter); *National Association of Regulatory Utility Commissioners v. Coleman* (3rd Cir.1976) 542 F.2d 11. (FRA regulation requiring nationally uniform monthly accident reports preempts same requirements in state statute but does not prevent states from requiring immediate notification of accidents or requiring railroads to submit copies of monthly reports filed with FRA to state); *Donelon v. New Orleans Terminal Co.,* 474 F.2d 1108 (5th Cir.1973) (where FRA adopted regulations covering same subject matter of track safety which Louisiana local officials sought to regulate and federal regulation was comprehensive in scope and detail, local government was without authority to adopt or continue in force regulations relating to track safety); *Missouri Pacific Railroad Co. v. Railroad Commission of Texas* (W.D.Tex.1987) 653 F.Supp. 617; *Norfolk and Western Railway Co. v. Burns* (E.D.Mich.1984), 587 F.Supp. 161; *Edwards v. Consolidated Rail Corp.* (D.C.D.C.1983), 567 F.Supp. 1087; *Southern Pacific Transportation Co. v. United States* (E.D.Ca.1978), 462 F.Supp. 1193; *Consolidated Rail Corp. v. City of Dover* (D.C.Del.1978), 450 F.Supp. 966; *Atchison, Topeka and Sante Fe Railway Co. v. Illinois Commerce Commission* (N.D.Ill.1977), 453 F.Supp. 920; *Norfolk and Western Railway Co. v. Pennsylvania Public Utility Commission* (1980), 489 Pa. 109, 413 A.2d 1037; *Monongahela Connecting Railroad Co. v. Pennsylvania Public Utility Commission* (1979), 45 Pa.Cmwlth. 164, 404 A.2d 1376. *See also, Southern Pacific Transportation Co. v. St. Charles Parish Police Jury* (E.D.La.,1983), 569 F.Supp. 1174 (in suit brought by railroad to enjoin enforcement of parish ordinance limiting speed of trains transversing parish to 25 miles per hour or less, parish speed limit ordinance held unconstitutionally burdensome in violation of the commerce clause, with minimal contribution to railroad safety).

disputed that the Conrail track located within Goshen City is part of the national railroad system and as such must be maintained according to the FRA standards contained in 49 C.F.R. §§ 200–238.[4] We conclude that 49 C.F.R. § 213.9(a) and the Goshen City Ordinance No. 163 regulate precisely the same subject matter—the maximum speed limit of trains. Because the FRA has exercised its authority and promulgated regulations regarding speed limits of trains, the Goshen City Ordinance may stand only if it falls within the narrow exception articulated in Section 205 and meets that section's three prong test.

Santini argues the municipal speed ordinance clearly addresses a local safety hazard because 36,000 people cross the Monroe Street tracks each day of the Goshen Fair and because the Monroe Street Crossing consists of three separate tracks that span over 100 feet in width, the increased time required to cross the triple tracks is in itself hazardous every day.

■ The language of Ordinance No. 163, however, is general and expansive. It provides:

"Section 1. It shall be unlawful for any railway company, or for any officer, agent, or employee thereof using steam motive power to run any locomotive or car *within the corporate limits of the City of Goshen* at a rate of speed exceeding twenty-five (25) miles per hour."
(emphasis added).

The ordinance is not narrowly tailored to address a specific local hazard at the Monroe Street crossing or a local hazard caused

by increased traffic to the Fairgrounds during the fair. The ordinance applies to the entire area of Goshen City. Santini has not presented any argument or citation to relevant authority which provides that an entire City constitutes an essentially local hazard. We conclude the entire area of Goshen City is not an essentially local hazard and therefore the Goshen City speed ordinance does not fall within the narrow exception provided in Section 205. Goshen City Ordinance No. 163 is preempted by the Federal Railroad Safety Act of 1970 and federal train speed limit regulations and was therefore correctly excluded from evidence at trial.

## II.  *Municipal Safety Gate Ordinance*

Santini argues the trial court incorrectly excluded from evidence Goshen City Ordinance No. 14–1 which requires Conrail to install and maintain railroad crossing safety gates at the intersection of its tracks with Monroe Street. Santini asserts this ordinance is not preempted by the Federal Railroad Safety Act of 1970 because no federal authority has been exercised to require crossing safety gates and therefore state and local authorities are free to regulate in this subject area. Conrail does not directly address this argument but instead argues the Goshen City ordinance was inadmissible because at the time of the collision no enabling legislation existed which would permit the City to enact ordinances regarding crossing safety gates. Alternately, Conrail argues the exclusion of the safety gate ordinance was not prejudicial and therefore was harmless error.

---

**4.** The railroad determines for itself the level of maintenance it wishes to provide on any specific area of track. The FRA regulations establish the maintenance standards for six grades of track, labeled class 1 through class 6. The record does not reveal what class the specific track at issue falls into.

While Santini may have alleged that violation of a federal speed regulation was negligence per se, Santini failed to do so. Santini was apparently unaware of the requirements contained in 49 C.F.R. § 213.9(a). Santini's theory of liability, as stated in her complaint, was that the Monroe Street crossing was particularly dangerous due to thousands of persons attending the fair and Conrail failed to exercise appropriate care by providing either flagmen or railroad

crossing gates at the crossing to assist minor pedestrians across the triple tracks, and that Conrail and its agents operated the train in a reckless manner at 50 m.p.h. in excess of the 25 m.p.h. speed limit imposed by Goshen City Ordinance No. 163. *See, Hendricks v. Missouri-Kansas-Texas Railroad Co.* (1986), Mo.App., 709 S.W.2d 483, 492 (in a wrongful death suit arising out of an automobile-locomotive collision, the Missouri Court of Appeals declines to address whether defendant's operation of train on Class II track 6 miles in excess of 25 m.p.h. speed limit contained in 49 C.F.R. § 213.9(a) was negligence per se because plaintiff's theory of liability was that the unusually dangerous character of the crossing made the train's speed of 31 m.p.h. excessive and therefore negligent.)

█ We conclude Municipal Ordinance No. 14–1, requiring Conrail to install and maintain railroad crossing safety gates at the intersection of its tracks with Monroe Street, is not a valid City ordinance and was not in force at the time of Nancy's death. We find no federal authority regulating the installation or maintenance of crossing safety gates. However, this court takes judicial notice of IND. CODE 8–6–7–1 [5] and 8–6–7.7–2 [6] which vests exclusive authority in the Indiana Public Service Commission to conduct hearings and declare as dangerous any grade crossing in the state which requires installation of warning signals or other crossing safety devices for the safety of the public, except as delegated to municipalities under the Uniform Highway Safety Act, I.C. 9–4–1–107. [7] The Uniform Highway Safety Act gives local government the authority to erect yield or stop signs on highways approaching the crossings after the state highway commission designates such crossings as "particularly dangerous." *See, City of North Vernon v. Baltimore and Ohio Railroad* (1986), Ind.App., 500 N.E.2d 1238. The City did not have the authority to require Conrail to install and maintain railroad crossing safety gates at the Monroe Street crossing and therefore the trial court was correct in excluding evidence of Municipal Ordinance No. 14–1 from trial.

### III. *Measure of Damages*

Santini argues the trial court erred in refusing to give her jury instruction number 7. Santini maintains the measure of damages in a wrongful death action includes the value of acts of kindness and attention Santini would have received from her child. [8]

Conrail contends the trial court correctly instructed the jury regarding the measure

5. I.C. 8–6–7–1 provides in part:
"The Public Service Commission of Indiana *shall have the exclusive power and it shall be its duty,* upon proper petition by any five (5) or more citizens of this state or the board of county commissioners or extra hazardous any grade crossing in this state which said commission shall find to be of such a character as that the safety of the users of such highway requires the installation of automatic train-activated warning signals or other crossing safety devices.
Such petition, hearing and all proceedings thereon shall be in conformity with the law governing petitions, hearings and proceedings before said commission in regard to rates and services of public utilities." (emphasis added).

6. I.C. 8–6–7.7–2 provides as follows:
"The Public Service Commission of Indiana, in authorizing the construction of any new grade crossing under the provisions of 8–6–1–7, shall have authority to order the installation of automatic train-activated warning signals at such crossing. The commission shall have further authority to order the installation, replacement, relocation, modernization or improvement of automatic train-activated warning signals at any grade crossing in the state in existence at the time the commission may issue such an order. *The authority of the commission* to require the installation of such signals *shall be exclusive, and shall supersede such power of any other local governmental agency.*" (emphasis added).

7. I.C. 9–4–1–107 states:
"Designating dangerous railroad grade crossings—Erection of yield or stop signs. The state highway commission, with reference to state highways and highway routes through cities, and local authorities, with reference to other highways under their jurisdiction, may designate particularly dangerous highway grade crossings of railroads. Notwithstanding the provisions of sections 31 (9–4–1–31 and 9–4–1–32) of this chapter requiring conformance with a manual of uniform traffic control devices, the commission or appropriate local agency shall erect either a yield or stop sign on the street or highway right-of-way approaching the designated crossing. When such stop signs are erected, the driver of any vehicle shall stop within fifty feet (50') but not less than ten feet (10') from the nearest track of such grade crossing and shall proceed only upon exercising due care." (emphasis added). *See also, City of North Vernon v. B & O Railroad, infra.*

8. We note that Santini has failed to comply with Appellate Rule 8.3(A)(7) which requires challenged jury instructions to be set out in their entirety in the brief and any alleged error supported by cogent argument and citation to relevant authority. In addition to a few introductory and concluding sentences, Santini's counsel simply reproduced verbatim a rather strident unreported trial court opinion in a different case. This is clearly an improper briefing practice on appeal. *See, Lenard v. Adams* (1981), Ind.App., 425 N.E.2d 211, 218. *See also Lucas v. Frazee* (1984), Ind.App., 471 N.E.2d 1163; *Grimm v. F.D. Borkholder Co., Inc.* (1983), Ind.App., 454 N.E.2d 84; *Sartain v. Blunck* (1983), Ind.App., 453 N.E.2d 324; *Vicarro v. City of Fort Wayne* (1983), Ind.App., 449 N.E.2d 1161; *Moore v. State* (1982), Ind.App., 441 N.E.2d 220.

of damages in a wrongful death of a child claim in the court's final instruction no. 22. Alternately, Conrail argues that Santini failed to object to the trial court's modification of Santini's tendered instruction 7 and Conrail's tendered instruction 11, which was then given without objection as court's final instruction no. 22. Conrail argues that since Santini failed to object to the modification or the giving of the final instruction, any error in the instruction is waived. We agree.

Santini's brief contains a portion of her tendered instruction no. 7, which included the value of lost love and affection within damages recoverable for the wrongful death of a minor child. The entire instruction is not reproduced in either Santini's brief or in the record. However, the record states that Santini's tendered instruction no. 7 was modified and combined with Conrail's tendered instruction no. 11 and then given as the court's final instruction no. 22. The significant modifications appear to be: 1) recovery for love and affection was removed from Santini's instruction, and 2) language was added to Santini's instruction, presumably from Conrail's instruction no. 11, instructing the jury specifically not to place any monetary value on mother's loss of love and affection. Santini did not object to the giving of the court's final instruction no. 22 at trial, and does not argue this was error on appeal. Santini confines her argument solely to whether the trial court's refusal to give her tendered instruction no. 7 was error.[9] However, we conclude that the court did give the jury Santini's instruction, as modified, as the court's final instruction no. 22.[10]

Indiana Rules of Trial Procedure, Rule 51(C), states in part:

"No party may claim as error the giving of an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury. The court shall note all instructions given, refused or tendered, and all written objections submitted thereto, shall be filed in open court and become a part of the record. Objections made orally shall be taken by the reporter and thereby shall become a part of the record."

The Court of Appeals stated the rule regarding modified instructions in *Oliver v. Morrison* (1982), Ind.App., 431 N.E.2d 140:

"Where a party tenders an instruction which the trial court modifies and gives to the jury as modified, and that party fails to object to either the modification or the giving of the instruction, any error in the instruction is waived. *American Optical Co. v. Weidenhamer,* (1980) Ind. App., 404 N.E.2d 606, vacated on other grounds; Ind. Rules of Procedure, Trial Rule 51(C)."

 The record does not show an objection by Santini to the giving of Final Instruction No. 22. Therefore, even if this instruction incorrectly stated the measure of damages for the wrongful death of a minor child, Santini has failed to preserve error for appeal.

The jury verdict is affirmed.

CONOVER, P.J., and YOUNG, J., concur.

---

**9.** We note the standard of review for refusal to give tendered instructions was recently summarized by Judge Young in *City of Lake Station v. Rogers* (1986), Ind.App., 500 N.E.2d 235, 240:

"In reviewing the refusal to give tendered instructions, the court must determine the following: 1) whether the tendered instruction correctly states the law; 2) whether the record would support the giving of the instruction; 3) whether the substance of the tendered instruction is covered by other instructions which were given; and 4) whether the refusal to give the instruction resulted in prejudice to the party who tendered it. Only upon an affirmative showing on all points will the resusal constitute reversible error. *Hogston v. Schroyer* (1983), Ind.App., 449 N.E.2d 291."

**10.** Even if instruction no. 7 had not been modified, the failure of Santini to object to an instruction contrary to her own concerning love and affection is an obvious waiver. The court could not logically give both an instruction to include love and affection and an instruction precluding it.