John E. BARNES, III, Appellant (Defendant Below),

v.

Polly Anna BARNES, Appellee (Plaintiff Below).

No. 66S03–9211–CV–927.

Supreme Court of Indiana.

Nov. 23, 1992.

Peter J. Rusthoven, Stanley C. Fickle, Michael A. Klein, Barnes & Thornburg, Indianapolis, Thomas C. Sopko, John C. Firth, Thomas C. Sopko Associates, South Bend, for appellant.

Charles R. Vaughan, Kelly Vaughan Busch, Cynthia L. Garwood, Vaughan and Vaughan, Lafayette, Courtney B. Justice, Elizabeth A. Justice, Logansport, for appellee.

Theodore Lockyear, Lockyear & Kornblum, Evansville, Sally F. Goldfarb, Lynn Hecht Schafran, Alison Wetherfield, NOW Legal Defense and Education Fund, New York City, for amici curiae, NOW Legal Defense and Education Fund, Indiana Nat. Organization for Women, Ass'n of Sexual Abuse Prevention Professionals, Equal Rights Advocates, the Men's Anti–Rape Resource Center, the Nat. Ass'n of Social Workers, the Nat. Coalition Against Domestic Violence, the Nat. Network for Victims of Sexual Assault, the Nat. Victim Center, the Northwest Women's Law Center, Trial Lawyers for Public Justice, and the Women's Law Center, Inc.

P. Gregory Cross, Cross, Marshall, Schuck, DeWeese, Cross & Feick, P.C., Muncie, for amicus curiae, Indiana Trial Lawyers Ass'n.

DICKSON, Justice.

Plaintiff-appellee seeks transfer following the decision of the Court of Appeals applying an absolute rule of parental tort immunity to reverse a judgment and order the dismissal of her damage action against her father alleging assault and rape. We grant transfer.

Plaintiff-appellee Polly Anna Barnes, the natural daughter of Margaret Barnes and defendant-appellant John E. Barnes, III, alleges that during 1985, when she was fifteen years of age, the defendant committed multiple acts of rape and other sexual brutality upon her during a four-day period, resulting in injuries including post-traumatic stress disorder. Less than two months later, Margaret filed for dissolution of her marriage to John. Polly commenced the present action two weeks before her eighteenth birthday and approximately three months after her parents' marriage dissolution was final. The resulting jury verdict and judgment awarded her compensatory damages of $250,000 and punitive damages of $3,000,000.

The defendant appealed, presenting the following issues: 1) application of the parental tort immunity rule, 2) use of the Indiana Rape Shield Statute to bar discovery and exclude evidence of plaintiff's prior sexual history, 3) allowing compensatory damages to include certain psychiatric care expenses already paid by the defendant, and 4) whether punitive damages were excessive and violative of due process. Applying the Indiana common law parental tort immunity rule, the Court of Appeals reversed the judgment and remanded with instructions to enter a judgment of dismissal. *Barnes v. Barnes* (1991), Ind.App., 566 N.E.2d 1042.

### 1. Parental Tort Immunity

The defendant contends that the trial court erroneously failed to grant his motion to dismiss asserting the doctrine of parental tort immunity. He correctly asserts that Indiana courts have recognized the immunity of parents from personal injury damage actions brought by their minor children alleging injuries sustained during the marriage. *Buffalo v. Buffalo* (1982), Ind.App., 441 N.E.2d 711; *Vaughan v. Vaughan* (1974), 161 Ind.App. 497, 316 N.E.2d 455; *Smith v. Smith* (1924), 81 Ind.App. 566, 142 N.E. 128.

The plaintiff responds that the doctrine of parental tort immunity should be abrogated because it no longer serves society and has been eroded by exceptions. She urges our rejection of parental tort immunity for reasons analogous to those that led us to abrogate interspousal tort immunity in *Brooks v. Robinson* (1972), 259 Ind. 16, 284 N.E.2d 794. As examples of excep-

tions to parental immunity, she cites provisions in the Indiana Guest Act [1] and cases allowing actions by a minor child against a non-custodial parent for post-dissolution injuries. *Gollnick v. Gollnick,* (1987), Ind. App., 514 N.E.2d 645, *modified in part on other grounds* (1988), Ind.App., 517 N.E.2d 1257, *aff'd* (1989), Ind., 539 N.E.2d 3; *Buffalo,* 441 N.E.2d 711.

The plaintiff also claims that the immunity contravenes the Indiana Constitution's "open courts" provision in Art. 1, § 12, the "equal privileges" clause in Art. 1, § 23, and the federal Fourteenth Amendment's equal protection clause. These constitutional arguments were rejected in *Vaughan,* and we decline to further consider them.

The briefs of all amici assert that the policy reasons utilized by Indiana and other jurisdictions favoring parental tort immunity have been discredited and that the general doctrine should be abrogated. Alternatively, amici NOW Legal Defense and Education Fund, et al., urge that parental immunity be restrictively applied to protect only conduct meeting a "reasonable and prudent parent" standard. They stress the need to prevent and punish incestuous sexual abuse and to allow redress for incest survivors. As its alternative to complete abrogation of parental immunity, amicus Indiana Trial Lawyers Association urges recognition of an exception to parental tort immunity in instances of "intentional torts willfully or maliciously inflicted upon children."

These issues are still in flux in American jurisprudence. Observing that the cases have "not yet drawn a clear picture of parental liability," W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 112, at 908 (5th ed. 1984), states:

> Though it is not possible to state an exact rule as to the scope of "parental discretion," there are patterns in the cases that may be significant. Courts apparently feel that the jury should not be permitted to second-guess the parent as to the exact amount of supervision, training or freedom a child should have. . . .

*Id.* at 908. Noting that an increasing number of courts seem to be questioning the need for the immunity altogether, Fowler v. Harper et al., *The Law of Torts* § 8.11, at 579–81 (1986), states:

> Most of the authorities supporting this development do, however, express certain reservations about the extent to which parents may be subject to liability in negligence for actions that appear to be closely associated with the parental relationship with children. . . . [I]t seems likely that the trend toward abrogation of the parent-child immunity will continue, and that such abrogation will become the dominant doctrine in the United States.

The Restatement (Second) of Torts (1977) rejects the immunity in § 895(G) but recognizes a privilege of parental application of reasonable force or confinement for control, training, and education in § 147(1).[2]

A recent overview discussing the approaches taken in cases reexamining parent-child tort immunity is provided in *Brunner v. Hutchinson Div. Lear–Siegler, Inc.* (D.S.D.1991), 770 F.Supp. 517, 521:

> To date, a substantial majority of jurisdictions have abrogated the doctrine either partially or completely. Of the states which have reconsidered parental immunity, few have eliminated the doctrine entirely. Three states have declined to adopt parental immunity or

---

**1.** Indiana Code § 9–3–3–1 provides generally that a motor vehicle operator without payment "is not liable" for damages arising from injuries to designated members of the driver's family unless caused by "wanton or willful misconduct." This statute has been interpreted as creating an exception to the Indiana parent-child immunity doctrine. *Farmers & Merchants State Bank v. Norfolk & Western Ry. Co.* (N.D.Ind. 1987), 673 F.Supp. 946.

**2.** Comment k to § 895G emphasizes the parental discipline privilege, noting that family romping, roughhouse play, and momentary flares of temper not producing serious hurt, may be normal in many households. It also recognizes the dual role of parental exercise of authority for supervision and provision of necessities as essential to the parent-child relationship.

have replaced it with a reasonable parent standard. Most jurisdictions have retained the doctrine, but have limited its application to certain circumstances. The principal variations relating to tort actions include: parental immunity or privilege only where the exercise of parental authority or discretion is somehow involved; parental immunity except where the injury was caused by negligence in a motor vehicle accident; parental immunity except to the extent of liability insurance; some cases deny immunity when the child's injury occurred in the course of the parent's vocational or business activities; most other states continue to adhere to the traditional rule of immunity for simple negligence torts. In no case is the immunity held to apply to intentional, willful, or malicious torts. [Footnotes omitted.]

In recent years decisions from other jurisdictions have generally refused to apply parental immunity in cases alleging rape. *Connolly v. Holt* (1991), 103 N.C.App. 516, 405 S.E.2d 807; *Hurst v. Capitell* (1989), Ala., 539 So.2d 264; *contra, Roller v. Roller* (1905), 37 Wash. 242, 79 P. 788.

Our nearby sister states have substantially limited or rejected parental tort immunity. Kentucky, Michigan, and Wisconsin abrogate the immunity with two exceptions: 1) the exercise of reasonable parental authority and 2) the exercise of ordinary parental discretion as to provision of care and necessities. *Horn v. Horn* (1982), Ky., 630 S.W.2d 70; *Plumley v. Klein* (1972), 388 Mich. 1, 199 N.W.2d 169; *Goller v. White* (1963), 20 Wis.2d 402, 122 N.W.2d 193. Ohio has abrogated parental tort immunity without reservation. *Shearer v. Shearer* (1985), 18 Ohio St.3d 94, 18 OBR 129, 480 N.E.2d 388; *Kirchner v. Crystal* (1984), 15 Ohio St.3d 326, 15 OBR 452, 474 N.E.2d 275. In Illinois the immunity does not apply to allegations of willful and wanton misconduct, nor does it preclude claims for injuries caused by a parent's negligent operation of an automobile. *Nudd v. Matsoukas* (1956), 7 Ill.2d 608, 131 N.E.2d 525;

*Cates v. Cates* (1992), 225 Ill.App.3d 509, 167 Ill.Dec. 689, 588 N.E.2d 330.

Determination of the present appeal, however, does not require us to decide whether to generally abrogate the immunity in parental negligence cases. Principles of judicial restraint counsel to the contrary. In the case before us, the plaintiff's action is not predicated upon a claim of parental negligence, but rather alleges intentional felonious conduct.[3] Existing Indiana case law provides sufficient guidance for resolution of this issue.

In *Treschman v. Treschman* (1901), 28 Ind.App. 206, 61 N.E. 961, the plaintiff sought damages for loss of eyesight and brain damage resulting when her stepmother grasped her ears and repeatedly jammed her head against a brick wall. Affirming a judgment for the plaintiff, the court said:

> It is not to be anticipated that acts so abhorrent to the family relation will be committed, but when they have been committed and have been committed *malo animo* as here charged, and an injury inflicted which can never be compensated for thereafter through the family relation, however exemplary it may be, courts should not hesitate to redress the wrong in so far as it may be redressed through an action for damages. We are not here concerned with the right of an adult child to sue a parent for a tort committed during infancy. There may be good reasons for denying this right where the minor child, after the injury, continues, possibly for many years, at home and unemancipated, and upon arriving at majority seeks to recover damages for such injury. And it may be admitted that there may be good ground for questioning an infant child's right of action against its father, or against the mother as head of the family, but we are not prepared to say that in *no case* should such an action be allowed.

*Id.*, 28 Ind. at 211, 61 N.E. at 963 (emphasis in original). This view was labelled "pure-

---

**3.** The plaintiff describes her complaint as "seeking redress for incestuous rape." Brief of Appellee to the Court of Appeals at 1.

ly *obiter dictum"* in *Smith,* 81 Ind.App. at 571, 142 N.E. at 129, which applied parental immunity to uphold a dismissal of a son's complaint seeking damages from his father for negligence and refusal to send the child to school, and alleging unspecified acts of violence that were "cruel, inhuman, excessive, unreasonable, unwarranted and malicious." The import of *Smith,* however, is minimized by *Vaughan,* 161 Ind.App. 497, 316 N.E.2d 455, a personal injury action alleging injuries to a four-year-old child resulting from the parents' negligent supervision. The general rule of parental immunity endorsed in *Smith* was viewed differently in *Vaughan* as follows:

> The court does continue that *under extreme circumstances the immunity may not exist,* however, a failure to supervise, as in this case, would not be sufficient, in our opinion to qualify.

*Vaughan,* 161 Ind.App. at 500, 316 N.E.2d at 457 (emphasis supplied).

Therefore, notwithstanding *Smith,* the discussions in *Treschman* and *Vaughan* provide support for the view that parental immunity should not be absolute. No Indiana case has applied the immunity to shield a parent from an action alleging intentional felonious conduct.

■ We conclude that when, as here, a cause of action is predicated upon a claim of intentional felonious conduct and there is no issue of parental privilege, the doctrine of parental tort immunity will not apply to preclude the action.

### 2. *Rape Shield Statute*

■ Contending that the trial court erred in using the Indiana Rape Shield Statute to bar defense evidence and to limit cross-examination of the plaintiff and her experts, the defendant argues that the statute applies only to criminal prosecutions.

The plaintiff responds that the trial court properly excluded evidence of the plaintiff's sexual conduct because its highly prejudicial nature outweighed its probative value, and, even if the exclusion was erroneous, that the defendant waived any error.

Before the commencement of trial, the plaintiff filed a motion in limine seeking to prohibit admission of evidence of her past sexual activities. The motion was supported by a separate memorandum based upon Indiana's Rape Shield Statute.[4] The trial court granted the motion with the sole exception that evidence of plaintiff's false accusations against others would be admissible with respect to allegations of the type she made against the defendant.

■ The Indiana Rape Shield Statute was not enacted to apply in civil cases. Located in our code within Title 35, Criminal Procedure, the statute expressly applies to a "prosecution" for a "sex crime." The purpose of the statute is "to shield victims of sex crimes from a general inquiry into their past sexual conduct and to keep these victims from feeling that they are on trial." *Thomas v. State* (1984), Ind., 471 N.E.2d 677, 679. Unlike the victim in a criminal case, the plaintiff in a civil damage action *is* "on trial" in the sense that he or she is an actual party seeking affirmative relief from another party. Such plaintiff is a voluntary participant, with strong financial incentive to shape the evidence that determines the outcome. It is antithetical to principles of fair trial that one party may seek recovery from another based on evidence it selects while precluding opposing relevant evidence on grounds of prejudice.

■ This is not unlike the personal injury plaintiff who seeks to conceal evidence

---

4. Indiana Code § 35–37–4–4(a) provides:

In a prosecution for a sex crime as defined in IC 35–42–4:

(1) Evidence of the victim's past sexual conduct;

(2) Evidence of the past sexual conduct of a witness other than the accused;

(3) Opinion evidence of the victim's past sexual conduct;

(4) Opinion evidence of the past sexual conduct of a witness other than the accused;

(5) Reputation evidence of the victim's past sexual conduct; and

(6) Reputation evidence of the past sexual conduct of a witness other than the accused;

may not be admitted, nor may reference be made to this evidence in the presence of the jury, except as provided in this chapter.

relevant to the claimed injury by invoking the physician-patient privilege. By placing one's mental or physical condition in issue, a party has done an act which is so incompatible with an invocation of the physician-patient privilege that the privilege is deemed waived as to that condition. *Canfield v. Sandock* (1990), Ind., 563 N.E.2d 526, 529; *Collins v. Bair* (1971), 256 Ind. 230, 237, 268 N.E.2d 95, 98.

We conclude that the Indiana Rape Shield Statute should not apply to exclude evidence in civil cases.

 The plaintiff does not directly challenge the defendant's assertion that the Indiana Rape Shield Statute applies only to criminal cases but contends that the trial court prudently looked to the statute as a framework to exclude evidence of her sexual conduct. She argues that the purposes underlying the Rape Shield Statute are equally served in a civil trial on grounds that any probative value is necessarily outweighed by the potential for prejudice to the plaintiff.

 In ruling on the relevancy of evidence, the trial court is accorded wide latitude to determine the probative value of evidence in contrast to its prejudicial impact. *Wallace v. State* (1985), Ind., 486 N.E.2d 445, 460, *cert. denied* (1986), 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 723. However, relevant evidence—that which logically tends to prove a material fact—is not inadmissible simply because of its prejudicial impact. *Chittenden v. State* (1982), Ind., 436 N.E.2d 86, 87. In *Pickett v. Kolb* (1968), 250 Ind. 449, 237 N.E.2d 105, this Court reversed a trial court judgment because of error in excluding prejudicial but probative evidence and observed that prejudicial impact "may not be expanded to the extent that it serves as a means of excluding otherwise competent evidence which is relevant to the issues involved in the trial."

*Id.*, 250 Ind. at 453, 237 N.E.2d at 108. It is only when the evidence is merely marginally relevant that the trial court has discretion to exclude it by balancing the probative value against prejudicial impact. *Hunter v. State* (1991), Ind., 578 N.E.2d 353, 357.

By her complaint, evidence, and statements of her counsel at trial, the plaintiff sought damages from the defendant alleging that her father's sexual assaults during a four-day period when she was 15 years old resulted in mental trauma necessitating psychiatric treatment with expenses in excess of $320,000 by the time of trial. Her expert witnesses testified that she suffered from post-traumatic stress disorder, that 90% of her trauma was caused by her father's attacks, and "that Polly exhibited psychological characteristics of a fifteen-year-old girl who had been raped by her father." [5] Brief of Appellee to the Court of Appeals at 19.

The defendant contends that the trial court ruling on the motion in limine, as implemented during trial despite his objections and offers to prove, prevented him from presenting the following testimony from Polly:

(1) that from age three until age six, seven or eight, she was sexually abused by her paternal grandmother. This included the grandmother committing oral sex on her at least ten and maybe twenty times, and inserting coke bottles and high heel shoes in her vagina;

(2) that when she was age four or five, an older boy came to the swimming pool at her house and shoved a stick in her vagina;

(3) that from approximately age eight through age 13 or 14, she was sexually abused by her brother John, Jr. This began with John, Jr. rubbing her vagina and later putting his fingers and his

---

5. In addition to its relevancy to the issue of damages, the plaintiff claimed that the existence of mental trauma also provided corroborating proof that the attack occurred, as seen in the following passage of her counsel's closing argument:

Now, let's look at the facts. She had post-traumatic stress disorder unquestionably.

And she had it from the rape of her father. That's the only evidence in the case. That's all the evidence. That's what it boils down to. How could she be where she is today if it didn't happen?

Record at 3622.

whole fist into her vagina. It also involved him committing oral sex on her and forcing her to commit oral sex on him, as well as placing his penis near her vagina and ejaculating. On some of these occasions, he would wear his mother's wigs; on others, he would put on the dress or apron from Polly's Raggedy Ann doll and paint red circles on his cheeks; on others, he would wear a Halloween mask and gloves with warts on them. At least one time, he put a coat hanger in her vagina and other times he poked her vaginal area with a fork. He would also cut her thighs and ·breasts with paring knives; burn her breasts with the flame of a lighter; and drop lighted matches on her. Over this five or six year period, these assaults occurred on an average of once a week unless he was away at school. Sometimes this abuse occurred in the house in Logansport and other times in the yard; (4) that when she was about age 12, an older boy locked her in a cabin behind a friend's house and assaulted her by fondling her breasts and vagina; (5) that her boyfriend raped her in Florida; (6) that after January 1985, she was raped by a stranger on a beach in Florida; (7) that on another occasion after January 1985, she was "gang raped" in Florida; and (8) that after she and Margaret [Polly's mother] moved back to Logansport, she was raped at the high school.

Brief of Appellant to the Court of Appeals at 16–17.

The defendant further contends that he was improperly prevented from cross-examining Polly's expert witnesses and his own expert witnesses regarding the causal relation of the excluded incidents and Polly's claim of post-traumatic stress disorder. In addition, the court barred .the defendant from questioning Polly's former boyfriend about his sexual activities with the plaintiff. The plaintiff had testified that during the attacks the defendant bit her breasts, stomach and thighs, drawing blood, and that she had bruises on her neck, throat, ribs, arms and legs, and scabs on her chest where he had bitten her. At trial the defendant offered to prove that, if permitted, the boyfriend would testify that during these same times he observed her fully unclothed except for shorts or underpants, he kissed and fondled her breasts and stomach, and he observed no bite or other marks on her breasts or elsewhere.

The defendant characterizes the plaintiff's case as being tried on the following theory: (1) Polly claims she had been raped by her father; (2) Polly's experts testify that she had suffered from post-traumatic stress disorder or rape trauma syndrome; and (3) Polly's accusations must be true since the alleged rapes by her father were the only possible source of Polly's trauma. The excluded evidence was relevant, the defendant argues, because it would have (1) fully rebutted the "traumatic stress" theme that was the centerpiece of Polly's case on both liability and damages and (2) directly undermined her credibility in testifying to the depraved acts allegedly committed by the defendant. Brief of Appellant to the Court of Appeals at 20. We agree.

The excluded evidence was obviously relevant to the issues presented in the case. Given its clear probative value, the trial court was not justified in excluding such evidence from the jury on grounds of prejudicial impact.

We likewise hold that the trial court erred in applying its ruling on the motion in limine to prohibit the defendant from inquiring about the plaintiff's sexual activities during his depositions of her and her mother. As distinguished from mere false accusations of sexual activity, actual sexual conduct is highly relevant to the issue of damages. Since the plaintiff was seeking compensation for mental injury resulting from the defendant's sexual conduct, it was clearly proper for the defendant to determine whether she had suffered other experiences which could have caused or contributed to her injury.

We find no merit in the plaintiff's claims of waiver. During trial, the defen-

dant sought to present evidence excluded by the trial court's ruling on plaintiff's motion in limine. These attempts occurred in the cross-examination of the plaintiff during her case in chief, in the cross-examination of her expert witnesses, during the defendant's presentation of plaintiff's videotape deposition, and during the defendant's direct examination of Polly's boyfriend. In each instance the defendant presented a full and detailed offer to prove. We reject the plaintiff's claim that the defendant inadequately sought to present evidence under the "false accusation" exception in the trial court's ruling and thereby waived his claim of error in excluding evidence of her history of sexual conduct. The exclusion issue was fully and fairly presented to the court during trial, and the defendant may present his claim of error on appeal.

▆▆▆ The plaintiff also contends that the defendant has waived his objection to the plaintiff's exclusion of prejudicial evidence by subsequently presenting his own motion in limine to exclude evidence to preclude "[a]ny reference to any incident whereby the defendant is alleged to have physically, psychologically or sexually abused Polly Barnes, Margaret A. Barnes, or any other individual, with the exception of the events alleged to have transpired on January 2, 3, 4, and 5, 1985." Record at 472. We disagree. The defendant's motion did not assert the Rape Shield Statute, but rather cited as authority the rule that one crime cannot be proved in order to establish the commission of another distinct crime because such evidence is highly prejudicial. Furthermore, the evidence sought to be excluded by the defendant was only marginally relevant to the issues in the case and therefore subject to balancing of probative value against prejudicial effect by the trial court. Finally, the defendant's motion was made after the trial court had granted the plaintiff's motion in limine so as to apply the Rape Shield Statute, over

defendant's clear and strenuous objections. His subsequent and unrelated motion should not waive or render harmless the trial court's initial error in deciding to exclude the evidence. *See Thomas v. Thomas* (1991), Ind., 577 N.E.2d 216.

We find that the exclusion of relevant evidence and the limitation of defendant's discovery regarding the plaintiff's sexual conduct were erroneous, and that the result was not harmless error. The judgment must be reversed and the case remanded for new trial.

### 3. Compensatory Damages

▆▆▆ The defendant contends that the trial court had no jurisdiction to award medical expenses because such expenses are within the exclusive authority of the court that granted the dissolution of his marriage to Polly's mother. He also argues that the trial court's instruction on compensatory damages erroneously permitted the jury to include past medical expenses he had already paid, plus those that he was required to pay in the future. Notwithstanding our reversal and remand for new trial, these issues are appropriate for discussion because they will likely arise in the event of retrial of this case.

At the trial the defendant objected to the court's instruction that in awarding any compensatory damages the jury could consider reasonable expenses of past and future necessary medical care and treatment. John's objection asserted that any medical expenses previously incurred had already been paid, not by Polly, but by him and his former wife, and that any future medical expenses were subject to a continuing order issued pursuant to their marriage dissolution.[6] During the trial, the defendant presented evidence that he had contributed over $160,000 towards payment of Polly's medical expenses. Record at 2896. The jury verdict awarded compensatory damages of $250,000.

---

6. The dissolution decree originally required John to pay "all psychiatric bills for minor daughter, Polly Anna Barnes." When it appeared that those expenses would reach almost $150,000 a year, the court entered a modifica-tion ordering Polly's mother, Margaret, to pay half of the cost. This order was affirmed in *Barnes v. Barnes* (1990), Ind.App., 549 N.E.2d 61.

Contending that the trial court cannot exercise jurisdiction in the same subject matter at the same time as the dissolution court, the defendant argues that the first court acquires exclusive jurisdiction if there is a significant overlap in the issues, citing *State ex rel. Int'l Harvester Co. v. Allen Circuit Court* (1976), 265 Ind. 175, 352 N.E.2d 487, and *Thrasher v. Van Buren Township of Monroe County* (1979), 182 Ind.App. 121, 394 N.E.2d 215. We disagree and find more persuasive the reasoning in *Anderson v. Anderson* (1979), Ind.App., 399 N.E.2d 391, a damage action brought by a plaintiff against her former husband as an attorney. Distinguishing the fact that in the dissolution the husband was involved in his personal capacity as a spouse, but that in the malpractice case he was being sued as an attorney, the *Anderson* court recognized that the dissolution decree did not bar plaintiff's action for legal malpractice and attorney deceit. *Id.* at 401.

Similarly, the obligation imposed upon John by the dissolution court was by reason of his capacity as Polly's father and as former husband of Polly's mother. In contrast, the present action seeks damages from John as a tortfeasor, not by reason of spousal or paternal obligations. We therefore hold that the past and potential future orders of the dissolution court regarding payment of Polly's medical expenses do not prevent the trial court from allowing inclusion of medical expenses among compensatory damages.

 Until the 1986 enactment of Indiana Code § 34–4–36–2,[7] our state had applied the common law collateral source rule which prohibited a wrongdoer from benefiting from compensation for loss received by a plaintiff from a source independent of the wrongdoer. *Aldridge v. Abram & Hawkins Excavating Co., Inc.* (1985), Ind.App., 474 N.E.2d 107, 108. The tortfeasor was *not* a "collateral source" for purposes of this rule. *Barker v. Cole* (1980), Ind.App., 396 N.E.2d 964, 970. While the statutory modifications to the rule, permitting admissibility of certain collateral source payments, were in effect at the time of trial, this Court has held that payments made by a tortfeasor are not within the meaning of collateral source payments admissible under the statute. *Manns v. State Dep't of Highways* (1989), Ind., 541 N.E.2d 929, 934. Thus the prior medical expense payments made by the defendant are not admissible under the collateral source statute. Moreover, such payments made by or on behalf of a defendant constitute "advance payments" and are inadmissible in evidence during the trial pursuant to Ind.Code § 34–3–2.5–1.[8] In the event of a retrial and resulting verdict awarding compensatory damages, the defendant may then present proof of his payments of the plaintiff's medical and psychi-

---

7. Ind.Code § 34–4–36–2 provides in pertinent part:

In a personal injury or wrongful death action the court shall allow the admission into evidence of:

(1) Proof of collateral source payments, other than:

(A) Payments of life insurance or other death benefits;

(B) Insurance benefits for which the plaintiff or members of the plaintiff's family have paid for directly; or

(C) Payments made by the state or the United States, or any agency, instrumentality, or subdivision thereof, that have been made before trial to a plaintiff as compensation for the loss or injury for which the action is brought;

(2) Proof of the amount of money that the plaintiff is required to repay, including worker's compensation benefits, as a result of the collateral benefits received; and

(3) Proof of the cost to the plaintiff or to members of the plaintiff's family of collateral benefits received by the plaintiff or the plaintiff's family.

8. Ind.Code § 34–3–2.5–1 provides:

In any action brought to recover damages for personal injuries, wrongful death or property damage no payment made by the defendant or the defendant's insurance company to or for the plaintiff or any other person, hereinafter called an "advance payment," shall be construed as an admission of liability by any person. Except as provided in section 2 of this chapter, evidence of such payment shall not be admissible during the trial for any purpose by either plaintiff or defendant: Provided further, That this chapter shall not apply to actions in which there is more than one defendant.

atric expenses, whereupon the court is required to reduce the verdict "to the extent that said award includes an amount paid by any such advance payment." Ind.Code § 34–3–2.5–2.[9]

### 4. *Punitive Damages*

The defendant contends that the $3,000,000 punitive damage award is excessive and violates the due process clause of the Fourteenth Amendment to the United States Constitution. While the reversal of the judgment and remand for new trial obviates the issue of excessiveness, the constitutional issue would remain for consideration but for the defendant's failure to object to the trial court's instructions regarding punitive damages. Indiana Trial Rule 51(C); *Santini v. Consolidated Rail Corp.* (1987), Ind.App., 505 N.E.2d 832. We further note that a substantially similar Fourteenth Amendment claim was recently rejected by the United States Supreme Court in *Pacific Mut. Life Ins. Co. v. Haslip* (1991), — U.S. —, 111 S.Ct. 1032, 113 L.Ed.2d 1.

### *Conclusion*

Transfer is granted, and the decision of the Court of Appeals is vacated. The judgment of the trial court is reversed. This cause is remanded for new trial or other proceedings not inconsistent with this opinion.

SHEPARD, C.J., and DeBRULER, GIVAN and KRAHULIK, JJ., concur.

---

**9.** Ind.Code § 34–3–2.5–2 provides:
 If in such action it is determined that plaintiff is entitled to recover, defendant may introduce evidence of any advance payment made, and the court shall reduce the award to the plaintiff to the extent that said award includes an amount paid by any such advance payment.