Norfolk and Western Railway Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent; Pennsylvania State Legislative Board, United Transportation Union, Intervenor.

Argued December 7, 1978, before Judges WILKINSON, JR., ROGERS and MACPHAIL, sitting as a panel of three.

*H. Woodruff Turner,* with him *Dennis M. Sheedy, Alan C. R. Lewis,* and *Kirkpatrick, Lockhart, Johnson & Hutchison,* and, of counsel, *Henry D. Light,* for petitioner.

*Candace N. Kreiger,* Assistant Counsel, with her *John B. Wilson,* Assistant Counsel, and *Kathleen Herzog Larkin,* Chief Counsel, for respondent.

*Thomas P. Shearer,* for intervenor.

OPINION BY JUDGE MACPHAIL, April 12, 1979:

This case is before us on appeal from a decision of the Pennsylvania Public Utility Commission (PUC) ordering Petitioner Norfolk and Western Railway Company (N&W) to discontinue within 120 days the operation of any of its locomotives which were not equipped with "flush type toilet[s] or similar device[s]" pursuant to 52 Pa. Code §33.62 (PUC Regulation).[1]

N&W is an interstate freight carrier operating in 12 states and Canada; its rail lines extend for 130 miles inside Pennsylvania's borders. It operates a total of 1,444 locomotives all of which may pass through Pennsylvania at various times. Before 1971, N&W's locomotives were equipped with flush type toilets which discharged untreated human waste directly onto railroad beds. In 1971, the Federal Food and Drug Administration (FDA) promulgated regulations relating to toilet facilities on railroad conveyances including regulations which prohibited the discharge of untreated human waste from railroad conveyances onto the roadbed. 21 C.F.R. §1250.51. To comply with that regulation N&W tested and considered a number of commercially available toilets and finally chose the NW Sanitary Toilet System (NW System). The NW System consists of four basic com-

---

[1] Section 33.62. Locomotives.

(a) All locomotives operated by or on each of the railroads in this Commonwealth, except those specifically exempted, shall be equipped with flush toilets or similar de-

ponents: a urinal, a chlorinator, a toilet, and an incinerator; only the latter two components are at issue here. The toilet consists of a hollow seat fastened to the floor of the locomotive. The user inserts a polyethelene bag through the hole in the seat and drapes the bag over the seat. After use, the bag is sealed by means of a non-slip tie and placed in a plastic holding container. The container is then placed in the hood of the locomotive until disposed of in an off-site pathological incinerator. One incinerator has been installed for this purpose at an N&W service stop in Rook, Pa.

N&W sought and received FDA approval for the NW System as to its method of disposing of human waste. Thereafter, N&W installed the system on 1,160 locomotives at a cost of $531,000.00.

On January 5, 1976, the Pennsylvania State Legislative Board, United Transportation Union (U.T.U.) filed a petition, which the PUC treated as a complaint, alleging that the NW System does not comply with 52 Pa. Code §33.62. After a public hearing the PUC found that the NW System did not comply with its regulation and entered an order directing compliance.

In its appeal to this Court, N&W contends that: (1) the PUC lacks authority to regulate toilet facilities on interstate railroad locomotives because States are preempted from enforcing such regulations by the Boiler Inspection Act, 45 U.S.C. §22 et seq. (Boiler Act) and/or Regulations of the Federal Food and Drug Administration, 21 C.F.R. §§1250.50, 1250.51; (2) Pennsylvania's attempt to regulate interstate locomotive toilet equipment imposes an undue burden on interstate commerce; (3) there was not substantial

---

vices which sanitarily dispose of human waste matter, together with toilet paper properly protected from soil prior to use.

evidence to support the PUC's finding that toilet equipment presently in service on N&W's locomotives are not sanitary; and (4) PUC erred in concluding that the toilet equipment presently in service on N&W's locomotives are not devices similar to flush toilets.

Since we consider the issue of federal preemption to be controlling, we will not address the remaining issues raised by N&W.

The Boiler Act, 45 U.S.C. §23, provides:

> It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 28 to 30 and 32 of this title and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for.

In *Napier v. Atlantic Coast Line Railroad Co.*, 272 U.S. 605 (1926), the United States Supreme Court declared two state regulations regarding locomotive equipment to be invalid under federal law. The Court said that the Boiler Act delegated to the Interstate Commerce Commission the power to regulate "the design, the construction and the material of every part of the locomotive and tender and of all the appurtenances." *Id.* at 611. The Court also held that the fact that the Interstate Commerce Commission had not promulgated regulations specifically addressed to the same subject matter covered by the state regula-

tions in question had no bearing upon the construction of the Boiler Act's delegating exclusive power to the Interstate Commerce Commission.

In 1968 the Pennsylvania Supreme Court in *Bessemer and Lake Erie Railroad Co. v. Pennsylvania Public Utility Commission,* 430 Pa. 339, 243 A.2d 358 (1968) (*Bessemer* I) held a PUC regulation which required flagging in all areas where a train would stop under circumstances in which it might be overtaken by another train invalid because the federal government had preempted the field by virtue of Section 25 of the Interstate Commerce Act, 49 U.S.C. §26.

In 1970, Congress enacted the Federal Railroad Safety Act, 45 U.S.C. §421 et seq. (FRSA). The purpose of the FRSA was to establish a nationally uniform system of railroad safety to the extent practicable. That Act did permit state regulation of railroad safety in two situations:

A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

45 U.S.C. §434 (Section 205).

The complainant contends and the PUC found that the FRSA now authorizes states to regulate railroad safety by virtue of the language quoted from Section 205. Since there is no federal regulation specifically

addressed to the matter of toilets on locomotives, the PUC concluded that it had the authority to do so. The strongest argument in support of that conclusion is this Court's decision in *Bessemer & Lake Erie Railroad Co. v. Pennsylvania Public Utility Commission,* 28 Pa. Commonwealth Ct. 461, 368 A.2d 1305 (1977). (*Bessemer* II.)

In *Bessemer* II this Court held that in the enactment of the FRSA, Congress had indicated very clearly its intent as to preemption in the regulation of railroad safety. Judge WILKINSON said, "the preemption argument of the Pennsylvania [Supreme] Court in *Bessemer* . . . is no longer valid." (Footnote omitted.) 28 Pa. Commonwealth Ct. at 467-68, 368 A.2d at 1308. Finding no federal regulation concerning flagging at the rear of a train in circumstances where the train might be overtaken by another train, this Court upheld the validity of a law nearly identical to that which the Supreme Court held invalid in *Bessemer* I. The decision in *Bessemer* II was not appealed.

Unless *Bessemer* II can be distinguished, its language would seem to control the instant case. The Boiler Act, it will be remembered, deals with *locomotive equipment*—"its boiler, tender and all parts and appurtenances thereof." The FRSA is concerned exclusively with *railroad safety*. In *Bessemer* I and *Bessemer* II the Courts were construing legislation relating to *railroad safety*. Here we are concerned with *locomotive equipment*. For that reason the rationale and decision in *Bessemer* II are not controlling upon us in this case.

Just as *Bessemer* II does not mandate that we ignore the Boiler Act neither does the FRSA require that we do so. The legislative history of the FRSA indicates conclusively that the Boiler Act was not repealed or amended by the FRSA. The House Interstate and Foreign Commerce Committee Report said,

in pertinent part, "[t]he bill reported by the committee does not repeal or amend existing rail safety statutes," and "it is the intent of the committee that the existing statutes continue to be administered and enforced as if this legislation had not been enacted." 1970 U.S. Congressional and Administrative News, 4105, 4114. Admittedly, the Secretary of Transportation has not adopted any rule, regulation, order or standard covering toilets on locomotives. However, we do not construe the language of the FRSA to mean that where there is federal preemption by virtue of a *pre-existing statute,* states are free to regulate until the federal government does so. Such an approach would seem to be completely contrary to the first sentence of Section 205 which states: "The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be *nationally uniform* to the extent practicable." 45 U.S.C. §434 (emphasis ours). There is the very real prospect that if the PUC regulation now before us is upheld, every state where N&W operates would be free to adopt different regulations regarding toilets on locomotives. We believe this is the very reason why the language in *Napier* left no room for equivocation—the Boiler Act preempts state regulation of every part of locomotives used in interstate commerce.

While we have previously stated in this opinion that we will not address the other issues raised in this case, all of which have been ably briefed and argued by counsel, we will comment that we do believe N&W has attempted to alleviate the health hazard created by previous disposal methods. The fact that the NW System does meet FDA standards is persuasive to us that N&W is not causing any dangers to the health or safety of its employees or the general population by the use of the NW System.

Order reversed.

ORDER

AND Now, this 12th day of April, 1979, the order of the Pennsylvania Public Utility Commission adopted June 29, 1977, and entered July 6, 1977, is reversed and the complaint is dismissed.