Monongahela Connecting Railroad Company, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Argued May 9, 1979, before President Judge Bow-
man and Judges Crumlish, Jr., Mencer, Blatt, Di-
Salle, Craig and MacPhail. Judges Wilkinson, Jr.
and Rogers did not participate.

*W. McCook Miller, Jr.,* with him *Kenneth L. Salmon* and *Kirkpatrick, Lockhart, Johnson & Hutchison,* for petitioner.

*James J. Kutz,* with him *Candace N. Kreiger,* Assistant Counsel, *John B. Wilson,* Deputy Chief Counsel, and *George M. Kashi,* Chief Counsel, for respondent.

*Thomas P. Shearer,* for additional respondent.

OPINION BY JUDGE MACPHAIL, August 17, 1979:

Monongahela Connecting Railroad Company (Railroad) brings this appeal from an order of the Pennsylvania Public Utility Commission (PUC) directing the Railroad to install an occupational block signal at the approaches of a blind curve on a railroad track within the Jones and Laughlin Steel plant at Pittsburgh. Following a head-on collision by two trains on the high grade eastbound track at the blind curve location, these proceedings were initiated with the PUC by the filing of a complaint by the Pennsylvania State Legislative Board, United Transportation Union (UTU) and John Collett, individually and on behalf of the UTU membership. The UTU is an additional respondent on appeal. The Railroad raises two issues for our consideration: whether the PUC is without jurisdiction to act in this case because the area of railroad safety with which we are concerned here has been preempted by federal law and whether the order of the PUC is supported by substantial evidence on the record. For the reasons which follow, we affirm.

## 1. FEDERAL PREEMPTION

The Railroad argues that the PUC was without jurisdiction to order the installation and use of block signals on the high grade eastbound track at the Jones and Laughlin plant because the regulation of such matters has been preempted by federal law, specifically, the Federal Railroad Safety Act of 1970 (FRSA), 45 U.S.C. §421 et seq.

The law of federal preemption was well summarized by the United States District Court in its opinion in *National Association of Regulatory Utility Commissioners v. Coleman*, 399 F. Supp. 1275, 1278 (M.D. Pa. 1975), *aff'd*, 542 F.2d 11 (3d Cir. 1976):

> The exercise of federal supremacy is not lightly to be presumed. It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. . . . [R]ecent decisions of the Supreme Court suggest that where Congress has not made clear its intention to preempt or where the conflict is only a potential one or peripheral to the purpose of the federal statute, state legislation will be allowed to stand. . . . Federal regulation of a field of commerce should not be deemed preemptive of state regulatory power unless the nature of the regulated subject matter permits no other conclusion or Congress has unmistakably so ordained. . . . The Supreme Court in certain contexts has resolved the preemption issue on the basis of whether a state enactment frustrates any part of the purpose of the federal legislation. . . . [F]ederal preemption is not lightly to be presumed, but where there is a pervasive and comprehensive scheme of federal regulation, particularly when the subject is one traditionally committed to federal regulation,

state enactments which stand as a major obstacle to the accomplishment of Congressional objectives are invalid. (Citations omitted.)

Section 205 of the FRSA, 45 U.S.C. §434, provides that:

The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

Despite the fact that Section 205 manifests Congress' intent to create a nationally uniform system of railroad safety and indicates, at least by implication, that such a federal system would preempt state regulation in the area, Section 205 expressly provides for State regulation of railroad safety in two limited situations: (1) where the Federal Government has not acted and (2) where (a) there exist essentially local safety hazards, (b) there is no incompatible Federal regulation and (c) the state regulation does not create an undue burden on interstate commerce. *See, Donelon v. New Orleans Terminal Co.,* 474 F.2d 1108, 1112 (5th Cir. 1973), *cert denied,* 414 U.S. 855 (1973); *Bessemer & Lake Erie Railroad Co. v. Pennsylvania Public Utility Commission,* 28 Pa. Commonwealth Ct. 461, 466, 368

A.2d 1305, 1307 (1977) (*Bessemer*). If the PUC order at issue here falls within one of these two exceptions, it may be allowed to stand.

The Railroad argues that the PUC is preempted from acting because the Federal Railroad Administration (FRA) has implemented regulations dealing with track safety standards, 49 C.F.R. §213.1 *et seq.* These regulations, however, relate to the roadbed, track geometry, track structure, track appliances and track related devices, and inspection. They make no specific reference to block signals or to their use on blind curves. Therefore, they do not preempt the PUC's order.

Our prior decision in *Bessemer, supra,* is controlling on us here. In *Bessemer,* we found that a federal law and an order promulgated pursuant to the law relating to railroad safety *generally* were not preemptive of a state law dealing *specifically* with railroad flagging. As we said there, "[R]egulation of one part of a very general area [by federal regulations] . . . while performing the same overall purpose [as state regulations] . . . will not oust or displace" the state regulations. 28 Pa. Commonwealth Ct. at 474, 368 A.2d at 1311. Similarly here, federal regulation of general track safety standards will not preempt a PUC order referring specifically to the installation of an occupational block signal at a particular site. *Cf., Donelon v. New Orleans Terminal Co., supra,* 474 F.2d at 1112 (federal regulations concerning roadbed and tracks held to be preemptive because they controlled "the precise subject matter of the state court suit").[1]

---

[1] The second exception to Section 205 of the FRSA was held to be inapplicable in *Donelon v. New Orleans Terminal Co.* because Section 205 refers to *state* action and the regulations in question in *Donelon* were promulgated by local *parishes.*

In the alternative, the Railroad argues that the PUC is precluded from ordering the installation of the occupational block signal system by the results of an FRA investigation following the collision. The FRA concluded that the accident was caused by human error in failing to follow radio transmission procedures and general railroad operating procedures, but that "compliance with the carrier rules and bulletins and with Federal Operating Practices Regulations should provide for safe operation at this point." The FRA clearly was authorized by Section 25 of the Interstate Commerce Act, 49 U.S.C. §26, following the investigation, to order the Railroad to install a block signal system on the curve "if found necessary in the public interest." The issue before us, then, is narrowed to whether the FRA's failure to enter such an order after the investigation of this particular accident precludes the PUC from doing so.

In *Bessemer,* 28 Pa. Commonwealth Ct. at 470, 368 A.2d at 1309, we held that Section 25 by "giving the FRA very broad, non-specific, non-comprehensive powers over the safety of railroad operations by the use of mechanical safety appliances," did not qualify as a "rule, regulation, order, or standard covering the subject matter of such State requirement" as set forth in the first exception of Section 205 of the FRSA. The same may not be true here. As we have noted, Section 25 of the Interstate Commerce Act does give the Interstate Commerce Commission power to regulate block signal systems. That authority may be sufficient to indicate federal preemption although the statutory language of Section 25 as it applies to the installation of block signal systems is not nearly so clear as the statutory language concerning locomotive equipment applicable to the circumstances before us in *Norfolk and Western Railway Co. v. Pennsylvania Public Utility Commission,* 41 Pa. Commonwealth Ct. 634, 399 A.2d 1184 (1979).

In any event, the PUC order may still stand if it meets the three tests set forth in the second exception to Section 205. There can be little doubt that the PUC order here was designed to eliminate or reduce an essentially local safety hazard. It is undisputed in the record that there is a blind curve on the high grade eastbound track of the Railroad's line at the Jones and Laughlin Steel plant in Pittsburgh. The order entered by the PUC relates *only* to that curve and is designed to prevent future similar accidents *on that curve.* The order relates to no other section of railroad track in the Commonwealth. It is purely local and is designed to reduce or eliminate a purely local safety hazard.

Moreover, the PUC order is not incompatible with any federal law, rule, regulation, order, or standard. The federal regulations cited by the Railroad as applicable to this case, 49 C.F.R. §213.1 *et seq.*, are too general to be preemptive of the PUC order. We note further that the order is not in conflict with any of those regulations. Neither is the order in conflict with the FRA's investigative report which we hold is not a federal law, rule, regulation, order, or standard encompassed within the meaning of Section 205.

As we have previously noted, under the terms of Section 25 of the Interstate Commerce Act, the FRA could have ordered the installation of a block signal system. It did not do so. Instead, in a letter it concluded that "compliance with the carrier rules and bulletins and with Federal Operating Practices Regulations *should* provide for safe operation. . . ." (Emphasis added.) It is undisputed on the record that the accident which resulted in the complaint now before us was the result of an error in the communications system; the FRA confined its investigation to that area. Significantly, the FRA did not state that further precautionary measures, such as the installation

of a block signal system, would *not* increase safety on the curve, nor did it state that such procedures would decrease safety on the curve. The UTU did not disagree with the FRA's conclusion as to what caused the accident. It did, however, seek greater safety guarantees than the FRA report provided and, therefore, filed the instant complaint before the PUC. There is no doubt that the PUC order mandates a more stringent standard than the FRA has required. Stringency, however, is not the equivalent of incompatibility. In fact, the second exception to Section 205 clearly permits states to adopt regulations more stringent than existing federal regulations. The FRA's determination, coupled with the fact that an earlier failure to comply with radio transmission procedures resulted in a head-on collision on the curve, provided sufficient latitude for the PUC to promulgate stricter safety standards in order to protect the railroad employees whose safety might be jeopardized on the high grade eastbound curve. The PUC has the power and the jurisdiction to take such action. *Monongahela Connecting Railroad Co. v. Pennsylvania Public Utility Commission*, 206 Pa. Superior Ct. 17, 20, 211 A.2d 113, 114 (1965).

Finally, we find that the PUC order will not create an undue burden on interstate commerce.[2] The order at issue involves the installation of an occupational block signal system at one location in the Commonwealth. With the exception of making the area safer, the installation will not affect any trains running on this particular track or on any other track in the Commonwealth. The Railroad concedes that the installation of a block signal system at this particular site would not burden interstate commerce. It argues,

---

[2] The cost of installing an occupational block signal system would be $31,000. The Administrative Law Judge found that such a cost would not be prohibitive in this case.           ,

however, that the order could set a dangerous precedent by allowing the PUC to require the installation of occupational block signals at all sharp curves in the Commonwealth, thereby creating such a burden. While the Railroad may hypothesize instances in which a PUC order such as the one here could impose an undue burden on interstate commerce, conjecture and hypothesis are not the functions of this Court. The Railroad has failed to show that the order will burden interstate commerce; in fact, it concedes that it will not do so. Without such proof we will not invalidate the order on that basis. *See Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 448 (1960).

## 2. SUBSTANTIAL EVIDENCE QUESTION

Because we have determined that the PUC order directing the Railroad to install an occupational block signal at the curve on the high grade eastbound track is not preempted by federal law, we now must determine whether the order is supported by substantial evidence. We hold that it is.

Our role in reviewing the evidence in an appeal from the PUC was clearly defined by Judge MENCER in *York v. Public Utility Commission,* 3 Pa. Commonwealth Ct. 270, 275-76, 281 A.2d 261, 263-64 (1971), *aff'd,* 449 Pa. 136, 295 A.2d 825 (1972):

> [W]e may not exercise our independent judgment on the record or resolve conflicting evidence. . . . Our inquiry is directed to whether there is substantial evidence to support the Commission's action. . . . Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . Substantial evidence has also been said to mean evidence affording a substantial basis of fact from which the fact in issue can reasonably be inferred. Substantial

> evidence is synonymous with competent and relevant evidence having a rational probative force. . . . (Citations omitted.)

The high grade eastbound track at the Jones and Laughlin Steel plant is used by trains moving both east and west. Visibility on one curve of the track is blocked by the stockhouse located on the inside of the curve. Movements on the track are controlled by a dispatcher located 2,000 feet west of the curve who communicates with train crews by way of radio, telephone, and signal lights. On September 6, 1976, due to human error, communications between the dispatcher and the train crews failed resulting in a head-on collision between east and westbound trains on the high grade eastbound track. None of this testimony was contradicted.

A testimonial conflict did arise, however, concerning the steps which should be taken to ensure that similar accidents do not occur in the future. John Collett, a conductor and general chairman of UTU, testified that problems relating to radio transmissions cause a safety hazard on the track. He conceded that if all radio instructions were given, received, understood, and followed no safety hazard would exist. He also testified, however, that a block signal system would increase safety standards on the high grade eastbound curve. He admitted that such a system could not physically prevent a train accident and that it, too, could be subject to human error, but, he added, a failure of the block signal system resulting in an accident would be a "very highly unlikely thing to happen. . . ." N.T. 33.

Richard L. McCombs and Paul F. Getty, General Superintendent and Superintendent of Transportation of the Railroad, respectively, both testified that the safest means of operation for the track in question was verbal communication. McCombs admitted

that in the past the operation had been "sloppy," but, he maintained, steps were being taken to correct past errors. Neither witness testified that installation of the occupational block signal system, although subject to human error, would *not* enhance safety on the high grade eastbound curve.

Upon a review of the testimony presented and the evidence introduced at the hearing below, we conclude that there was substantial evidence upon which the PUC could have concluded, as it did, that a reasonable means of providing additional safeguards where the instant accident occurred would be the installation of occupation block signals on the approaches to the curve. That conclusion, in turn, supports the PUC order directing the Railroad to install an occupational block signal on the high grade eastbound curve.

Order affirmed.

ORDER

AND Now, this 17th day of August, 1979, the order of the Pennsylvania Public Utility Commission at C. 22377 entered on July 5, 1978, is affirmed.