MINNESOTA CENTER FOR EN-
VIRONMENTAL ADVOCA-
CY, Relator–Appellant,

v.

METROPOLITAN COUNCIL,
Respondent.

No. C6–97–1694.

Supreme Court of Minnesota.

Jan. 14, 1999.

William J. Keppel, Charles Holtman, Minneapolis, Mark Ten Eyck, Minn. Center for Environmental Advocacy, St. Paul, for relator/appellant.

Sherry A. Enzler, Forrest D. Nowlin, Doherty, Rumble & Butler, P.A., St. Paul, Jay R. Lindgren, Mark Thompson, Metropolitan Council, St. Paul, for respondent.

Richard M. Dahl, Dunkley, Bennett & Christensen, P.A., Minneapolis, for amicus curiae Minnesotans for ISTEA.

A.W. Clapp III, for amici curiae Sierra Club North Star Chapter and Voyageurs Region Nat. Park Ass'n.

Charles N. Nauen, William A. Gengler, Lockridge Grindal Nauen & Holstein P.L.L.P., Minneapolis, for amicus curiae Minnesota Transp. Alliance.

Michael D. Madigan, Johnson & Madigan, Minneapolis, for amicus curiae Taxpayers for Common Sense.

Virginia M. Stark, Lindstrom, for amicus curiae Land Stewardship Project.

Stephen C. Rathke, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, for amicus curiae Alliance for Metropolitan Stability.

## OPINION

STRINGER, Justice.

This matter arises out of a judicial challenge to the respondent Metropolitan Council's (Council) approval of the 1998–2000 Transportation Improvement Program (TIP). Appellant, the Minnesota Center for Environmental Advocacy (MCEA), is concerned specifically with the Stillwater Bridge Replacement Project (Project) included in the TIP. Appellant alleges that the Project is inconsistent with the Metropolitan Development Guide/Blueprint (Blueprint) and therefore respondent's approval of the 1998–2000 TIP is inconsistent with the requirements of section 134(h)(5) of the Federal Intermodal Surface Transportation Efficiency Act of 1991, 23 U.S.C. §§ 101 *et seq.* (1994) (ISTEA). After respondent approved the 1998–2000 TIP with the Project included, appellant filed a writ of certiorari in the court of appeals seeking review of respondent's decision pursuant to Minn.Stat. Chs. 480A and 606 (1996). The court of appeals denied the writ citing a lack of jurisdiction. The court reasoned that respondent's decision was not a quasi-judicial act but rather a quasi-legislative act, and that quasi-legislative acts are not reviewable by certiorari. We agree and affirm.

We begin with a review of the interplay between federal and state agencies' oversight responsibility for interstate transportation policy and planning—a relationship that, although complex, is critical to an efficient national and regional surface transportation system.

ISTEA governs the disbursement of federal transportation funds to the states. To be eligible for federal funds, urban areas with a population of at least 50,000 must designate a metropolitan planning organization (MPO). 23 U.S.C. § 134(b) (1994). Respondent Metropolitan Council, a political subdivision of the State of Minnesota, is the designated MPO for the Twin Cities metropolitan area.[1] Minn.Stat. § 473.146, subd. 4 (1996). ISTEA directs the MPO to adopt a long range transportation plan establishing metropolitan

---

1. The Metropolitan Council's jurisdiction includes most of Anoka, Carver, Dakota, Hennepin, Ramsey, Scott, and Washington counties. *See* Minn.Stat. § 473.123, subd. 3c (1996).

transportation policies for a 20–year forecast period. 23 U.S.C. § 134(g) (1994).[2]

In December 1996, respondent adopted the Metropolitan Development Guide/Blueprint (Blueprint) and 1996 Transportation Policy Plan (TPP) to comply with 23 U.S.C. § 134(g). The Blueprint and TPP were also adopted to comply with Minn.Stat. § 473.146, subds.1, 3 (1996), the state counterpart to the

**2.** 23 U.S.C. § 134(g) provides in part:
Development of Long Range Plan.
(1) In general. Each metropolitan planning organization shall prepare, and update periodically, according to a schedule that the Secretary determines to be appropriate, a long range plan for its metropolitan area in accordance with the requirements of this subsection.
(2) Long range plan. A long range plan under this section shall be in a form that the Secretary determines to be appropriate and shall, at a minimum:
  (A) Identify transportation facilities (including but not necessarily limited to major roadways, transit, and multimodal and intermodal facilities) that should function as an integrated metropolitan transportation system, giving emphasis to those facilities that serve important national and regional transportation functions. In formulating the long range plan, the metropolitan planning organization shall consider factors described in subsection (f) [the 16 factors are listed at footnote 7, *infra*] as such factors relate to a 20–year forecast period.
  (B) Include a financial plan that demonstrates how the long-range plan can be implemented, indicates resources from public and private sources that are reasonably expected to be made available to carry out the plan, and recommends any innovative financing techniques to finance needed projects and programs, including such techniques as value capture, tolls and congestion pricing.
\* \* \* \*
(4) Participation by interested parties. Before approving a long range plan, each metropolitan planning organization shall provide citizens, affected public agencies, representatives of transportation agency employees, private providers of transportation, and other interested parties with a reasonable opportunity to comment on the long range plan, in a manner that the Secretary deems appropriate.
(5) Publication of long range plan. Each long range plan prepared by a metropolitan planning organization shall be (i) published or otherwise made readily available for public review; and (ii) submitted for information purposes to the Governor at such times and in such manner as the Secretary shall establish.

**3.** Minn.Stat. § 473.146, subds. 1, 3, requires respondent to "adopt a long-range comprehensive policy plan for transportation" which includes:

ISTEA requirement for a long-term transportation plan.[3] Among many other elements, the TPP identifies potential projects to achieve these long range planning goals. From the list of potential projects in the TPP, respondent is required by ISTEA to develop a TIP identifying specific projects to propose for construction in the metropolitan area using federal transportation funds. 23 U.S.C. § 134(h)(1), (2) (1994).[4] The TIP is

(1) a statement of the needs and problems of the metropolitan area with respect to the functions covered, including the present and prospective demand for and constraints on access to regional business concentrations and other major activity centers and the constraints on and acceptable levels of development and vehicular trip generation at such centers;
(2) the objectives of and the policies to be forwarded by the policy plan;
(3) a general description of the physical facilities and services to be developed;
(4) a statement as to the general location of physical facilities and service areas;
(5) a general statement of timing and priorities in the development of those physical facilities and service areas;
(6) a detailed statement, updated every two years, of timing and priorities for improvements and expenditures needed on the metropolitan highway system; and
(7) a general statement on the level of public expenditure appropriate to the facilities.

**4.** 23 U.S.C. § 134(h)(1), (2) provides:

Transportation Improvement Program.
(1) Development. The metropolitan planning organization designated for a metropolitan area, in cooperation with the State and affected transit operators, shall develop a transportation improvement program for the area for which such organization is designated. In developing the program, the metropolitan planning organization shall provide citizens, affected public agencies, representatives of transportation agency employees, other affected employee representatives, private providers of transportation, and other interested parties with a reasonable opportunity to comment on the proposed program. The program shall be updated at least once every 2 years and shall be approved by the metropolitan planning organization and the Governor.
(2) Priority of projects. The transportation improvement program shall include the following:
  (A) A priority list of projects and project segments to be carried out within each 3–year period after the initial adoption of the transportation improvement program.
  (B) A financial plan that demonstrates how the transportation improvement program can be implemented, indicates resources from public and private sources that are reasonably expected to be made available to carry out the plan,

prepared annually and covers a 3–year planning and construction period. *Id.* The TIP may only identify projects for federal funding if respondent determines that the projects are consistent with the long range plan adopted pursuant to § 134(g). *Id.* § 134(h)(3), (5).[5]

The Stillwater bridge project has long been a part of respondent's complex planning process. Respondent first considered replacing the existing Stillwater bridge in 1977 because the bridge, located in downtown Stillwater, was considered inadequate to handle large trucks, buses, and recreational vehicles, as well as projected growth in traffic levels. In 1978, respondent's Major River Crossing Task Force issued a study entitled "Major River Crossings in the Twin Cities Metropolitan Area." The study concluded that the existing Stillwater bridge was "expected to have a major deficiency in capacity by 1990." In 1989, respondent updated its 1978 study and ranked metropolitan area bridges that needed to be built, replaced or rehabilitated by the year 2010. The study ranked the Stillwater bridge third among the top twenty bridges in need of replacement or rehabilitation. Based on the studies, the Project was included in the TPP's from 1988 to 1996 and in the TIP's from 1991 to 1998.

The 1998–2000 TIP, approved August 14, 1997, again includes the Stillwater Bridge Project. As proposed, the Project would include expansion of Minnesota Trunk Highway 36 and construction of a new four-lane bridge across the St. Croix River from Stillwater, Minnesota to St. Joseph/Houlton, Wisconsin. Following approval, appellant, a not-for-profit environmental organization, filed a writ of certiorari in the court of appeals seeking review of respondent's decision to approve the TIP. Appellant claimed that respondent's decision to approve the 1998–2000 TIP with the Project included was motivated by political pressure rather than proper transportation planning.

The court of appeals dismissed the writ for lack of jurisdiction and did not reach the substantive issue of appellant's writ of certiorari. *Order of the Court of Appeals*, No. C6–97–1694 (March 6, 1998) (*Order*). Relying heavily on our recent decision in *Meath v. Harmful Substance Compensation Bd.*, 550 N.W.2d 275 (Minn.1996), the court of appeals held that respondent's decision to approve the 1998–2000 TIP with the Project included was quasi-legislative, not quasi-judicial, and therefore its decision is not reviewable by writ of certiorari to the court. *Order* at 2–5.

Our decision in *Meath* sets forth a framework for determining if a decision is quasi-judicial or quasi-legislative. *Meath* involved a judicial challenge to a decision by the Harmful Substance Compensation Board which denied Meath's claim for compensation. *Id.* at 275. Decisions by the Board were essentially unenforceable offers of compensation to a claimant. *Id.* at 279. Claimants were free to reject the Board's offer and commence a civil action against the parties responsible for the claimant's injuries, and the Board's response would be inadmissible in such an action.

■ We took the opportunity in *Meath* to more clearly define quasi-judicial conduct:

> *[Q]uasi-judicial conduct is marked by an investigation into a disputed claim and a decision binding on the parties.* Even though the phrase "quasi-judicial act" has sometimes been so broadly defined that it

---

and recommends any innovative financing techniques to finance needed projects and programs, including value capture, tolls, and congestion pricing.

**5.** 23 U.S.C. § 134(h)(3), (5) provides:
(3) Selection of projects. Except as otherwise provided in subsection (i)(4), project selection in metropolitan areas for projects involving Federal participation shall be carried out by the State in cooperation with the metropolitan planning organization and shall be in conformance with the transportation improvement program for the area.

\* \* \* \*

(5) Included projects. A transportation improvement program for a metropolitan area developed under this subsection shall include projects within the area which are proposed for funding under this title and chapter 53 of title 49 and which are consistent with the long range plan developed under subsection (g) for the area. The program shall include a project, or an identified phase of a project, only if full funding can reasonably be anticipated to be available for the project within the time period contemplated for completion of the project.

can be said to include almost any administrative decision based on evidentiary facts, it seems to us that we would be well-advised today to apply the term only to those administrative decisions which are based on evidentiary facts and which resolve disputed claims of rights.

*Id.* at 279 (emphasis added).

As to a quasi-judicial proceeding resolving disputed claims, we reasoned that if "every administrative decision which is based on evidentiary facts developed through investigation can for that very reason be characterized as 'quasi-judicial,' then almost every administrative decision is 'quasi-judicial' even though few such decisions adjudicate any right or obligation of contending parties." *Id.* at 277.

■■■ A separate concurrence in *Meath* proposed an additional indicator that further sharpened the analysis.[6] An agency performs a quasi-judicial function when it "applies a prescribed standard to reach a conclusion that affects the legal interests of the persons before it * * *." *Id.* at 280. Adopting the additional standard proposed by the concurrence in *Meath*, the three indicia of quasi-judicial actions can be summarized as follows: (1) investigation into a disputed claim and weighing of evidentiary facts; (2) application of those facts to a prescribed standard; and (3) a binding decision regarding the disputed claim.

With regard to the first of the indicia, the court of appeals concluded that respondent's decision to approve the 1998–2000 TIP was "not a decision based on a hearing and the taking of evidence. To the contrary, it is a decision that was reached by a political body through ongoing discussion and debate * * *." *Order* at 4. Regarding the second indicator, the court found that no prescribed standard guided respondent's decision. The court noted that "[g]iven the general nature of the TPP and the Blueprint, it is not imaginable that a project could be declared inconsistent as a matter of law." *Id.* Finally, as to the third indicator, the court concluded that

respondent's decision was not binding on the parties but rather a "political decision that can be modified at will." *Id.* at 5. Thus the court of appeals concluded that none of the *Meath* indicia were met, respondent's proceedings were quasi-legislative, and the court therefore lacked jurisdiction.

■■■ We review *de novo* the issue of jurisdiction without deference to the lower court. *See In re Conservatorship of Foster*, 547 N.W.2d 81, 85 (Minn.1996). Certiorari is an "extraordinary remedy" only available to review judicial or quasi-judicial proceedings and actions; conversely, it is not available to review legislative or administrative actions. *Honn v. City of Coon Rapids*, 313 N.W.2d 409, 414 (Minn.1981); *see also Western Area Business and Civic Club v. Duluth School Bd. Indep. Distr. No. 709*, 324 N.W.2d 361, 364 (Minn.1982).

## I.

■■■ We agree with the court of appeals that our decision in *Meath* is an appropriate and helpful framework for guidance. Applying the first of the three *Meath* indicia, we begin with a consideration of whether respondent investigated and weighed evidentiary facts relevant to a disputed claim in approving the 1998–2000 TIP. As respondent acknowledges in its brief, its deliberative process involved researching the costs, needs, advantages, location, and size and capacity of the Project, as well as receiving comments, both in support of and in opposition to the Project from a wide range of public officials and interested parties, including appellant.

It is clear that the research and public comment aspects of respondent's deliberative process is far more typical of a legislative proceeding than of a judicial proceeding. While the ultimate goal of both proceedings is to reach an informed decision on relevant and sometimes conflicting facts, the similarities end there. Respondent takes no evidence in accordance with formal or informal evidentiary rules, testimony is not given un-

---

6. Justice P. Anderson specially concurred, joined by Justice Tomljanovich, concluding that while the respondent Harmful Substance Control Board's decision was quasi-judicial, the preclusion of judicial review was constitutional because the Board's decision was not final and was subject to the approval of the affected party. *Meath*, 550 N.W.2d at 284–285.

der oath, and there are no formally identified parties to the proceeding offering evidence to support a legal claim. Respondent's decisions, as with other governmental agencies, are guided by both objective information and public input. We conclude that respondent's gathering and consideration of information is vastly different from the judicial process of determining facts for the purpose of reaching a legal conclusion in resolution of adversarial claims—therefore it cannot be characterized as quasi-judicial under the first of the *Meath* three indicia.

## II.

■ Turning to the second of *Meath's* three indicia, we consider whether respondent used a prescribed standard in deciding to approve the 1998–2000 TIP. Appellant claims that the TPP and Blueprint, taken together, outline a vision and set of goals that serve as a standard for all metropolitan transportation projects. In support of this claim, appellant cites the following provision in ISTEA:

A transportation improvement program for a metropolitan area developed under this subsection shall include projects within the area * * * which are consistent with the

long-range plan developed under subsection (g) for the area.

23 U.S.C. § 134(h)(5) (1994). Appellant claims that this provision establishes the TPP and Blueprint as a binding prescribed standard for transportation projects and that the TIP must then be consistent with these planning documents.

While it is true that 23 U.S.C. § 134(h)(5) requires that projects identified in the TIP be consistent with "the long range plan developed under subsection (g) for the area," it is too great a leap to conclude that the TPP and Blueprint are sufficiently specific to establish a prescribed standard. The six introductory goals of the Blueprint are just that— and nothing in ISTEA indicates that these introductory goals are intended to serve as a prescribed standard. Further, § 134(g) refers not just to the Blueprint, but it also incorporates the TPP, a comprehensive document that is required to include, among many other elements, 16 planning considerations. *Id.* § 134(g)(2). Many of these 16 considerations are not necessarily consistent, as the considerations illustrate the many policy choices that the TPP must incorporate.[7] Given the broad and diverse elements required of a long range plan pursuant to § 134(g), it is clear that it is not intended to

---

7. The sixteen factors are listed at 23 U.S.C. § 134(f) (1994 & Supp.1996), which provides:

Factors To Be Considered. In developing transportation plans and programs pursuant to this section, each metropolitan planning organization shall, at a minimum, consider the following:

(1) Preservation of existing transportation facilities and, where practical, ways to meet transportation needs by using existing transportation facilities more efficiently.

(2) The consistency of transportation planning with applicable Federal, State, and local energy conservation programs, goals, and objectives.

(3) The need to relieve congestion and prevent congestion from occurring where it does not yet occur.

(4) The likely effect of transportation policy decisions on land use and development and the consistency of transportation plans and programs with the provisions of all applicable short- and long-term land use and development plans.

(5) The programming of expenditure on transportation enhancement activities as required in section 133.

(6) The effects of all transportation projects to be undertaken within the metropolitan area, without regard to whether such projects are publicly funded.

(7) International border crossings and access to ports, airports, intermodal transportation facilities, major freight distribution routes, national parks, recreation areas, monuments and historic sites, and military installations.

(8) The need for connectivity of roads within the metropolitan area with roads outside the metropolitan area.

(9) The transportation needs identified through use of the management systems required by section 303 of this title.

(10) Preservation of rights-of-way for construction of future transportation projects, including identification of unused rights-of-way which may be needed for future transportation corridors and identification of those corridors for which action is most needed to prevent destruction or loss.

(11) Methods to enhance the efficient movement of freight.

(12) The use of life-cycle costs in the design and engineering of bridges, tunnels, or pavement.

(13) The overall social, economic, energy, and environmental effects of transportation decisions.

(14) Methods to expand and enhance transit services and to increase the use of such services.

(15) Capital investments that would result in increased security in transit systems.

(16) Recreational travel and tourism.

**844**

serve as a prescribed standard. Moreover, ISTEA only requires that projects be "consistent with" the long range plan. Two federal circuit courts, interpreting the phrase "consistent with" in other planning statutes, have held that the term does not require strict compliance but rather congruity or compatibility. *See Environmental Defense Fund v. Environmental Protection Agency*, 82 F.3d 451, 457 (D.C.Cir.1996); *see also NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898–99 (9th Cir.1986). Based on the non-specific nature of the planning documents and the flexible compliance inherent in the language of the statute, respondent did not have a prescribed standard for its decision to approve the 1998–2000 TIP and did not make a quasi-judicial decision under the second of *Meath's* three indicia.

### III.

Finally, applying the third of the *Meath* indicia, we must determine if respondent's decision to approve the 1998–2000 TIP amounts to a binding decision that affected a disputed claim. Appellant claims that the decision to include the Project in the TIP and then approve the TIP amounts to a final, binding decision regarding a disputed claim. Clearly this is not so. The TIP is nothing more than a proposal for planned projects that may change from year to year both as to inclusion on the list and as to priority. Approval of the TIP is approval of a statement only and has no binding effect on the legal rights of parties. Thus, the decision to approve the 1998–2000 TIP falls far short of the type of binding decision regarding a disputed claim required by the third indicator of a quasi-judicial proceeding.

Failure to meet any of the three *Meath* indicia is fatal to petitioner's claim that respondent's proceedings were quasi-judicial. The order of the court of appeals denying certiorari for lack of jurisdiction is affirmed.

Affirmed.