In the Matter of the SPEED LIMIT FOR the UNION PACIFIC RAILROAD THROUGH the CITY OF SHAKOPEE, State of Minnesota.

No. C1–99–1722.

Court of Appeals of Minnesota.

May 16, 2000.

Review Dismissed July 7, 2000.

David A. Donna, Kurtis A. Greenley, Robert C. Friday, Lindquist & Vennum P.L.L.P., Minneapolis, for relator Union Pacific Railroad Company.

James J. Thomson, Karen R. Cole, Kennedy & Graven, Chartered, Minneapolis, for respondent City of Shakopee.

Considered and decided by WILLIS, Presiding Judge, KALITOWSKI, Judge, and HALBROOKS, Judge.

## OPINION

KALITOWSKI, Judge.

Relator Union Pacific Railroad challenges the authority of the Commissioner of the Minnesota Department of Transportation to impose a ten-miles-per-hour

speed limit along a one-mile segment of its track in downtown Shakopee. Union Pacific argues that: (1) because the state's ability to regulate train speed is preempted by federal regulations promulgated under the Federal Railroad Safety Act (FRSA), 49 U.S.C. §§ 20101–21311 (1994), the FRSA's savings clause under 49 U.S.C. § 20106 does not apply; and (2) even if the savings clause applies to the regulation of train speed, the commissioner erred in finding the requirements of the savings clause were met. After filing its appeal, Union Pacific made a motion requesting a determination that this court lacks subject-matter jurisdiction to hear this matter as a certiorari appeal.

## FACTS

In 1858, respondent City of Shakopee passed an ordinance granting Southern Minnesota Railroad Company, a predecessor of relator Union Pacific Railroad, permission to run its main track down any east-west street within the city limits. The railroad laid its track down the center of Second Avenue, which runs through Shakopee's present-day central business district. This track, which remains in regular use, is now owned and operated by Union Pacific. The one-mile segment of the track between mileposts 27.3 and 28.3 is unique in Minnesota because it runs down the middle of a city street and has a large number of grade crossings and pedestrian and vehicular traffic.

Shakopee's central business district is approximately 13 square blocks. Its buildings are not subject to setback requirements. All of the streets in the business district are two-way streets, but the eastbound and westbound lanes of Second Avenue are divided by the railroad track. The distance from the center of the track to the edge of the closest curb of either traffic lane varies between eight and one-half to nine feet.

All of the north-south streets that intersect with Second Avenue have stop signs. Motorists making left turns onto Second Avenue from any north-south street must cross the railroad tracks and check for trains and traffic approaching from the east and west as well as for oncoming north or south traffic. Similarly, a motorist turning left from Second Avenue onto a north-south street must be aware of both approaching trains and oncoming traffic.

There are ten grade crossings along the one-mile stretch of track on Second Avenue between mileposts 27.3 and 28.3, six of which are within the central business district. The grade crossings have various combinations of warning devices: some have only crossbucks and/or stop signs, and others have crossbucks with flashing signals or overhead mast flashers. Crossbucks and stop signs are the least effective traffic warning devices for grade crossings. None of the crossings in Shakopee use the two most effective warning devices, automatic gates with time circuitry and automatic flashers with constant-warning time circuitry.

The grade crossings along the one-mile segment of track met Minnesota Department of Transportation's (MnDOT) safety standards at one time, but MnDOT has not reviewed the crossings in recent years. In the past, MnDOT has recommended that Shakopee close some grade crossings in order to improve safety along the track segment. Shakopee's director of public works agrees that the city does not need ten crossings in the one-mile segment and that track safety would improve if more crossings were closed.

Six reported accidents have occurred at grade crossings in the one-mile segment in the five years prior to the hearing in this matter. All six took place at grade crossings that have crossbucks but no mechanical warning devices or flashing lights. The most frequent type of grade-crossing accident in Shakopee results from motorists violating traffic laws.

Shakopee has experienced a substantial population growth in recent years. A traffic-data calculation conducted in February

1999 reflects that more than 2,000 vehicles travel every day on most of the north-south streets between mileposts 27.3 and 28.3, and the busiest street averages more than 4,000 vehicles per day. A high volume of pedestrians also cross over the track, and many cross outside the pedestrian-crossing areas. Union Pacific considers the pedestrians who cross outside the designated areas to be trespassers.

The one-mile length of track along Second Avenue is a small segment of a 335-mile line running from St. Paul to LeMars, Iowa. A variety of trains travel along the track, including two daily scheduled through freights of 100 to 110 cars, two local trains, and unscheduled through freights and light engines. For many years, Union Pacific and its predecessor observed a self-imposed "head end" speed restriction of 10 miles per hour while passing through downtown Shakopee and 30 miles per hour elsewhere in the city.

In the summer of 1998, Union Pacific upgraded its track in downtown Shakopee to a class-four track, which has a maximum speed limit of 60 miles per hour under federal regulations. *See* 49 C.F.R. § 213.9 (1999). Union Pacific notified Shakopee that by February 15, 1999, it intended to increase the speed of all of its trains within the city to 30 miles per hour. Union Pacific set the 30–miles–per–hour speed limit based on its assessment of the local conditions in downtown Shakopee, including the proximity of parking, the visual clutter, the number of crossings in the city, and its experience with trespassing pedestrians.

In February 1999, Shakopee petitioned the commissioner of MnDOT to impose a speed limit of ten miles per hour for trains operating on the Union Pacific line on Second Avenue, pursuant to the commissioner's authority to regulate train speed on grade crossings over public highways and city streets under Minn.Stat. § 219.383, subd. 1 (1998). Union Pacific filed its opposition to the petition and a contested case hearing was held before an Administrative Law Judge (ALJ) in April

1999. Consistent with the ALJ's written recommendation, the commissioner issued an order setting a ten-miles-per-hour speed limit along the one-mile track segment between mileposts 27.3 and 28.3 until Union Pacific and Shakopee can improve the safety and warning mechanisms at the crossings and reduce visual clutter in the area.

Union Pacific filed this certiorari appeal, arguing that the commissioner's authority to impose railroad speed limits is completely preempted by the Federal Railroad Safety Act, 49 U.S.C. §§ 20101–21311 (1994), and the regulations promulgated thereunder. This court granted Shakopee's motion to appear as a respondent in the appeal. Union Pacific subsequently filed a rule 127 motion seeking a determination that this court lacks jurisdiction to hear the matter as a certiorari appeal because the commissioner's decision was quasi-legislative rather than quasi-judicial.

## ISSUES

1. Is the commissioner's imposition of a ten-miles-per-hour train speed limit in downtown Shakopee a quasi-legislative act and therefore not reviewable by writ of certiorari?

2. Is the commissioner's attempt to regulate train speed under Minn.Stat. § 219.383 (1998) completely preempted by the Federal Railway Safety Act and the maximum train speed limitations promulgated thereunder?

3. Does the commissioner's imposition of a ten-miles-per-hour train speed limit in downtown Shakopee meet the requirements of the "savings clause" of 49 U.S.C. § 20106 (1994)?

## ANALYSIS

### I.

We initially address Union Pacific's motion for a determination that this court lacks jurisdiction to hear the appeal. Union Pacific argues that because the com-

missioner's imposition of a speed limit was a quasi-legislative action, an appeal cannot properly proceed by writ of certiorari under Minn.Stat. §§ 14.63 to 14.68 (1998). We disagree.

 As a general matter, "certiorari is an 'extraordinary remedy' only available to review judicial or quasi-judicial proceedings and actions." *Minnesota Ctr. for Envtl. Advocacy v. Metropolitan Council,* 587 N.W.2d 838, 842 (Minn.1999) (quoting *Honn v. City of Coon Rapids,* 313 N.W.2d 409, 414 (Minn.1981)). Certiorari is not available to review an agency's legislative or purely ministerial acts. *Mahnerd v. Canfield,* 297 Minn. 148, 152, 211 N.W.2d 177, 179 (1973). A quasi-judicial proceeding involves investigation into a disputed claim that weighs evidentiary facts, applies those facts to a prescribed standard, and reaches a binding decision. *Minnesota Ctr. for Envtl. Advocacy,* 587 N.W.2d at 841–44.

Union Pacific contends that the commissioner's decision concerning Shakopee's petition was not "quasi-judicial." But because the Administrative Procedure Act (APA) explicitly provides for certiorari appeal in this case, we conclude it is not necessary to address this issue.

 Under the APA, with certain exceptions not applicable here, a party aggrieved by an agency's final decision in a contested case hearing may seek judicial review by certiorari under sections 14.63 to 14.68. M.S.A. § 14.63 (1998). The statute authorizing the commissioner to set train speed limits states:

> The commissioner of transportation, on petition of a city council or a railway corporation, may fix and determine after a hearing a reasonable speed for the operation of an engine or train on and over a railroad crossing of a public highway or street in that city.

Minn.Stat. § 219.383, subd. 1 (1998). The commissioner's notice and order for hearing on Shakopee's petition plainly stated that the proceeding would be governed by the rules for contested case hearings under Minn.Stat. §§ 14.48 through 14.69 (1998) and Minn. R. 1400.5100 through 1400.8400. The final decision of the commissioner indicated that any aggrieved party could seek review in accordance with Minn.Stat. §§ 14.63 through 14.68.

Because this matter proceeded as a contested case hearing, we conclude certiorari review is appropriate under the plain language of Minn.Stat. § 14.63. Union Pacific's motion is denied.

## II.

 The preemptive effect of a statute involves a question of law, which this court reviews de novo. *Sorenson v. St. Paul Ramsey Med. Ctr.,* 457 N.W.2d 188, 190 (Minn.1990). In considering questions of law, "reviewing courts are not bound by the decision of the agency and need not defer to agency expertise." *St. Otto's Home v. State, Dep't of Human Servs.,* 437 N.W.2d 35, 39–40 (Minn.1989) (citations omitted). Union Pacific argues that federal regulations promulgated under the Federal Railroad Safety Act (FRSA)[1] have entirely preempted the field of train speed limits and that the commissioner of MnDOT therefore retained no authority under state law to impose the ten-miles-per-hour speed limit in downtown Shakopee. We disagree.

 Minnesota law has long provided that the commissioner of MnDOT may, upon petition of a railway or city council, fix and determine a reasonable train speed on and over a railroad crossing over a public highway or city street. Minn.Stat. § 219.383, subd. 1. With its enactment of the FRSA in 1970, however, Congress largely preempted state authority to regulate railroad safety. By enacting the

---

1. The FRSA was originally enacted at 45 U.S.C. §§ 421 et seq., and was recodified at 49 U.S.C. §§ 20101–21311 in 1994.

FRSA, Congress intended to provide for the creation of uniform national safety standards in the railroad industry. *See, e.g.,* 49 U.S.C. § 20106 (1994) ("Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable."); H.R.Rep. No. 91–1194, *reprinted in* 1970 U.S.C.C.A.N. 4104, 4110 (stating that the railroad industry "has a truly interstate character calling for a uniform body of regulation and enforcement").

 When a state law conflicts with or frustrates federal law, the state law must give way. U.S. Const., Art. VI, cl. 2; *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993). Preemption generally will not lie, however, in the absence of clear congressional intent. *Easterwood,* 507 U.S. at 664, 113 S.Ct. at 1737. When a statute contains an express preemption clause, the plain wording of the clause is necessarily the best evidence of Congress's preemptive intent. *Id.*

Despite the broad, sweeping nature of the FRSA, Congress provided a "savings clause" that permits a state to continue to regulate railroad safety under two specific circumstances. 49 U.S.C. § 20106. Under the first exception, a state may adopt or continue to enforce

> a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

*Id.* In 1971, the Federal Railroad Administration (FRA) adopted regulations that set safety standards for railroad tracks, including the maximum speed limits for all trains based on the classification of the track on which they run. 42 C.F.R. § 213.9 (1999). The Supreme Court has determined that by enacting these regulations, the FRA elected to cover the subject matter of train speed regulation with respect to track conditions, including the conditions posed by grade crossings. *Easterwood,* 507 U.S. at 675, 113 S.Ct. at

1743. The commissioner's regulation of train speed in downtown Shakopee therefore cannot fall within this first exception.

The second exception provides that even if the secretary has chosen to regulate the subject matter, a state may still adopt or continue in force an additional or more stringent law, regulation, or order, provided that it (1) is necessary to eliminate or reduce an essentially local safety hazard; (2) is not incompatible with a law, regulation, or order of the United States government; and (3) does not unreasonably burden interstate commerce. *Id.* at 662, 113 S.Ct. at 1737. Under the plain language of the preemption clause, if these three requirements are met, state regulation of any essentially local safety hazard is permissible.

 Union Pacific argues that the commissioner is "negatively preempted" from imposing a train speed limit in Shakopee. We disagree. Negative preemption occurs when a federal agency affirmatively declines to impose additional regulations in some field over which it has chosen to exercise its authority. *See, e.g., Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 178, 98 S.Ct. 988, 1005, 55 L.Ed.2d 179 (1978). Union Pacific argues that the FRA has negatively preempted all regulation of train speed because it has chosen to set only maximum train speeds and because the agency elsewhere has expressed its general position that "[f]ederal regulations preempt any local speed restrictions on trains." 63 Fed.Reg. 33999 (1998).

Accepting Union Pacific's argument would require that we ignore the express terms of the second provision of the savings clause, which permits state regulation if the three-part test is met, even if the FRA has chosen to regulate that area of railroad safety. *See* 49 U.S.C. § 20106. Moreover, the FRA itself does not consider its maximum train speed limits to be appropriate in every situation. To the contrary, the regulation indicates that the maximum speed limits represent minimal

safety standards, "applicable to specific track conditions existing in isolation," and that a combination of conditions may require railroads to take additional remedial action to ensure safe operations over a particular track. 49 C.F.R. § 213.1 (1999). The regulation also indicates that, its preemptive effect notwithstanding, states may regulate track safety standards where necessary to address an "essentially local safety hazard." 49 C.F.R. 213.2 (1999).

We also reject Union Pacific's argument that the Supreme Court's decision in *Easterwood* effectively precludes any local regulation of train speed. In *Easterwood*, the Supreme Court addressed the preemptive effect of the FRA's maximum train speed limits in the context of a personal injury claim. *Easterwood*, 507 U.S. at 673, 113 S.Ct. at 1742. The plaintiff, who had been injured in a collision with a train, alleged that even though the train's speed was within the federally mandated maximums, the railroad had breached its common-law duty to operate the train at a moderate and safe rate of speed. *Id.* The Court rejected the argument that this common-law rule fell within the savings clause simply because the standard of care includes a duty to respond appropriately to an "essentially local safety hazard." *Id.* at 675, 113 S.Ct. at 1743. The Court stated:

> The state law on which respondent relies is concerned with local hazards only in the sense that its application turns on the facts of the case. The common law of negligence provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions.

*Id.* Contrary to Union Pacific's argument, the Court did not find that the FRSA broadly proscribed all state regulation of train speed, even for essentially local safety hazards. Rather, it concluded that the common-law negligence rule did not meet the requirements of the savings clause because it was not tailored to address a specific essentially local safety hazard.

We conclude that the express language of the savings clause permits state regulation to eliminate or reduce an essentially local safety hazard, including state regulations regarding train speed.

### III.

We next address the issue of whether the commissioner's imposition of a speed limit on the one-mile segment of track in downtown Shakopee meets the requirements of the savings clause. The commissioner's decision involved a determination of whether the essentially undisputed facts met the three requirements of the 49 U.S.C. § 20106. The application of a statute to the undisputed facts of a case involves a question of law, which we review de novo. *Boubelik v. Liberty State Bank*, 553 N.W.2d 393, 402 (Minn.1996). An agency's legal determination may be due judicial deference, however, "if the underlying decision-making process is designed to effectively produce a correct or just result or if the decision is informed by considerable expertise." *Buettner v. City of St. Cloud*, 277 N.W.2d 199, 204 (Minn. 1979).

Union Pacific first disputes whether the track constitutes an essentially local safety hazard. Because this is an issue of first impression in Minnesota, we look to other jurisdictions for guidance. Other courts have struggled to interpret the essentially local safety hazard requirement. In rejecting a municipality's attempt to restrict all train speeds within city limits, one court noted that a permissible restriction

> would have to apply to specific crossings and not to all crossings within a town. In other words, the governing body would have to take into consideration specific hazards at a given crossing and use that as the basis for a more stringent ordinance or statute.

*Landrum v. Norfolk So. Corp.*, 836 F.Supp. 373, 375 (S.D.Miss.1993). Consistent with this approach, a crossing with extremely limited sight lines and a regu-

larly malfunctioning warning signal might constitute an essentially local safety hazard, especially if the road provides motorists with the only means of access to some location. *Stone v. CSX Transp., Inc.*, 37 F.Supp.2d 789, 796 (S.D.W.Va.1999) (reversing summary judgment for railroad and remanding for consideration of whether conditions constitute a local safety hazard).

In contrast, a hazardous railroad crossing was not "essentially local" simply because it lacked active warning devices, had a steep grade and angle, and was in close proximity to a highway crossing. *O'Bannon v. Union Pacific R.R. Co.*, 960 F.Supp. 1411 (W.D.Mo.1997). The *O'Bannon* court noted that the FRA's maximum speed regulations already factored in track conditions, including grade crossing conditions. *Id.* at 1421 n. 11. Under this rationale, only conditions that the FRA has not contemplated in promulgating maximum train speed limits can qualify as essentially local safety hazards. Other courts have agreed that a condition present at many intersections, such as multiple tracks with rail cars that obstruct view, is not unique and so does not constitute an essentially local safety hazard. *See, e.g., Earwood v. Norfolk S. Ry. Co.*, 845 F.Supp. 880, 888 (N.D.Ga.1993).

Here, the commissioner determined that the track segment in downtown Shakopee qualifies as an essentially local safety hazard because (1) it runs down the middle of a city street with parallel lanes of traffic on both sides; (2) it has ten grade crossings within one mile; (3) it has a high volume of pedestrian and vehicular traffic; (4) the trains run in close proximity to traffic and buildings; and (5) the segment of track is the only place in Minnesota exhibiting this unique combination of factors. Union Pacific argues that under *O'Bannon*, the numerous crossings and volume of pedestrians and traffic in downtown Shakopee cannot create an essentially local safety hazard because these factors are not unique. We disagree. It is these multiple, common, hazardous factors coupled with the truly distinguishing characteristic of a track that runs between opposing lanes of traffic down the middle of a downtown street that renders the one-mile segment of track in Shakopee an essentially local safety hazard.

[16, 17] The savings clause also requires that a regulation be "necessary to eliminate or reduce" the hazard. 49 U.S.C. § 20106. Union Pacific contends that the train speed regulation is not "necessary" because Shakopee has a host of other options available to address the problem. We disagree. The savings clause does not offer an internal definition of "necessary," and the legislative history is not illuminating. But we decline to interpret "necessary" to mean "absolutely necessary" so that the existence of alternative remedial measures would prohibit the commissioner from acting. Rather, we are persuaded by other courts' less stringent interpretations of the term "necessary" in other statutory contexts, where "necessary" means "reasonably necessary for the accomplishment of the end in view under the particular circumstances." *Latchis v. State Highway Bd.*, 120 Vt. 120, 134 A.2d 191, 194 (1957) (citing condemnation statute), *superseded by statute as stated in State Highway Bd. v. Hazen*, 126 Vt. 46, 221 A.2d 579, 582 (1966) (noting that legislature subsequently defined "necessary" giving the term a broader meaning).

Evidence in the record suggests that other measures may reduce the hazard, but the record also supports a conclusion that train speed is a relevant factor with respect to safety at railroad crossings and that pedestrians regularly jaywalk across the tracks in downtown Shakopee. Indeed, the commissioner's decision recognizes that implementing more effective warning devices may sufficiently ameliorate the safety hazard in downtown Shakopee to permit a higher speed limit. The order indicates that the speed limit will remain in effect until Union Pacific and Shakopee "can develop and implement a

plan to improve the grade crossings between mileposts 27.3 and 28.3," whereupon the commissioner will consider raising the speed limit upon appropriate petition.

■ The commissioner's even-handed resolution of the dispute reflects Congress's wisdom in delegating the responsibility to regulate local safety hazards to the neutral expertise of the appropriate state authority. *See, e.g., CSX Transp., Inc. v. City of Tullahoma,* 705 F.Supp. 385, 388 (E.D.Tenn.1988) (concluding that Congress intended state regulatory agencies to determine whether conditions constitute an essentially local safety hazard). Although we review questions of statutory interpretation de novo, we are reluctant to disregard the commissioner's conclusion that the ten-miles-per-hour speed limit is a reasonably necessary means of reducing a local traffic hazard when the safety of the traveling public is at issue.

The last two requirements of the savings clause are also met here. The train-speed limitation is not incompatible with federal laws or regulations. The only train speeds that the FRA imposes are maximum limits based on track size and condition under 49 C.F.R. § 213.9, and this regulation does not prohibit the reduction of train speeds under limited circumstances. The regulation specifically acknowledges the savings clause, belying Union Pacific's argument that the FRA has precluded any additional regulation of local train speeds by virtue of its policy declarations.

■ Union Pacific concedes that the 11- to 13-minute delay in its schedule does not, standing alone, constitute an undue burden on interstate commerce, but argues that significant delays could result throughout the interstate rail system as a result of excessive local speed regulations. We concur with other jurisdictions that have rejected similar arguments as unduly speculative. *See, e.g., Monongahela Connecting R.R. Co. v. Pennsylvania Pub. Util. Comm'n,* 45 Pa.Cmwlth. 164, 404 A.2d 1376, 1380 (1979) (rejecting railroad's argument that cumulative cost of installing many safer signal systems would prove unduly burdensome, where order required installation of a single system on a particular dangerous curve). The potential cumulative effect of relatively insignificant burdens on interstate commerce may be enough to invalidate a state regulation. *See, e.g., Katzenbach v. McClung,* 379 U.S. 294, 300, 85 S.Ct. 377, 382, 13 L.Ed.2d 290 (1964). But a strict application of that rule to every essentially local safety hazard that otherwise meets the requirements of the savings clause would entirely rob the exception of its potency. We conclude the commissioner's order does not unduly burden interstate commerce.

## DECISION

Pursuant to Minn.Stat. § 14.63 (1998) we have jurisdiction to review this matter as a certiorari appeal from a decision in a contested case hearing. The decision of the Commissioner of the Minnesota Department of Transportation to impose a ten-miles-per-hour speed limit on the one-mile segment of railroad track in downtown Shakopee is not preempted by federal law and meets the requirements of the savings clause under 49 U.S.C. § 20106 (1994).

**Affirmed; motion denied.**